NEW JERSEY ASSOCIATION OF
HEALTH CARE FACILITIES,
INC., et al., Plaintiffs,

v.

Alan J. GIBBS, et al., Defendants.

Civ. A. No. 90–1908 (JCL).

United States District Court,
D. New Jersey.

March 4, 1993.

Fox, Rothschild, O'Brien & Frankel by Johnathan D. Weiner, Princeton, NJ, Cohen, Shapiro, Polisher, Shiekman & Cohen by Daisy B. Barreto, Lawrenceville, NJ, Reed, Smith, Shaw & McClay by Paul F. Leonard, Jr., Eugene Tillman, Washington, DC, for plaintiffs.

Robert J. Del Tufo, Atty. Gen. of NJ by Michael J. Haas, Deputy Atty. Gen., Trenton, NJ, Covington & Burling by Mark H. Lynch, Charles A. Miller, Ulanda D. Rippy, Washington, DC, for defendants.

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................. 886
II.   THE PARTIES ................................................. 886
III.  THE FEDERAL MEDICAID PROGRAM ................................ 887
IV.   THE NEW JERSEY MEDICAID REIMBURSEMENT SYSTEM ............... 888
      A.   GENERAL CONSIDERATIONS ................................ 888
      B.   CALCULATION OF NURSING PAYMENTS ....................... 891
      C.   ADVISORY STANDARDS FOR NURSE STAFFING ................. 892
      D.   INFLATION ADJUSTMENTS ................................. 893
V.    PRELIMINARY INJUNCTION STANDARDS ........................... 893
VI.   PROCEDURAL COMPLIANCE WITH THE BOREN AMENDMENT ............ 893
      A.   THE PROCEDURAL LAW .................................... 893
      B.   THE FINDINGS REQUIREMENT .............................. 895
      C.   THE ADEQUACY OF NEW JERSEY'S PROCEDURE ................ 895
VII.  SUBSTANTIVE COMPLIANCE WITH THE BOREN AMENDMENT .......... 898
      A.   THE SUBSTANTIVE CHALLENGE ............................. 898
      B.   THE EXPERTS AND THEIR ROLES ........................... 898
      C.   PRESUMPTION OF VALIDITY ............................... 899
      D.   COST–RATE ANALYSIS .................................... 899
      E.   INDIVIDUAL COMPONENTS OF NEW JERSEY'S PLAN ........... 907
           i.    NURSE STAFFING ANALYSIS ........................ 907
           ii.   CONTRACT NURSING COSTS ......................... 913
           iii.  INFLATION ADJUSTMENTS .......................... 914
           iv.   GEOGRAPHICAL WAGE EQUALIZATION ................. 916
VIII. IRREPARABLE HARM ........................................... 917
      A.   THE LEGAL STANDARDS ................................... 917
      B.   PLAINTIFFS' ALLEGATIONS OF IRREPARABLE HARM ........... 917
      C.   ELEVENTH AMENDMENT CONSIDERATIONS ..................... 927

IX.   BALANCING OF HARDSHIPS AND THE PUBLIC INTEREST .......... 928
X.    CONCLUSION ................................................ 929

OPINION RE DENIAL
OF PRELIMINARY
INJUNCTION

LIFLAND, District Judge.

## I. INTRODUCTION

1. Plaintiffs bring this action under 42 U.S.C. § 1983, alleging that defendants have deprived plaintiffs of rights secured under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (commonly referred to as the "Medicaid program"). Specifically, plaintiffs allege that defendants' Medicaid payment rates are not "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to ... provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards...." 42 U.S.C. § 1396a(a)(13)(A) (commonly referred to as the "Boren Amendment"); Complaint at ¶ 3. Plaintiffs also allege that defendants have failed to follow certain procedures required by the Boren Amendment. This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331.

2. Plaintiffs filed a motion for a preliminary injunction, seeking the following specific relief: (a) adjustment of the method for calculating reimbursement for nursing costs; (b) inclusion of the costs of contract nursing in the calculation of the limit on nursing costs; (c) modification of the State's salary region groupings; (d) use of a different inflation index in calculating rates; and (e) reimbursement of all allowable costs for all facilities that fall below the statewide median for such costs.

3. The evidentiary record on the pending motion is extensive. Plaintiffs filed affidavits from representatives of each of the named plaintiff facilities as well as an affidavit from their expert witness, Dr. Barbara Manard ("Dr. Manard"), which was accompanied by a lengthy report prepared by Dr. Manard ("Manard Report"). Defendants filed decla-

rations from Saul Kilstein ("Kilstein"), the Director of the New Jersey Division of Medical Assistance and Health Services ("DMAHS"), the division of the New Jersey Department of Human Services responsible for administering and developing policy for the Medicaid program, Ann Kohler ("Kohler"), the Assistant Director of DMAHS, and defendants' expert witness, Dr. Gretchen Engquist ("Dr. Engquist"). These affidavits and declarations were accompanied by numerous exhibits. The lengthy depositions of both experts and the representatives of the named plaintiffs were also filed as part of the record. A six-day hearing on the preliminary injunction motion was held at which the two experts testified and presented additional exhibits. The parties have also provided the Court with oral argument, extensive briefing and supplemental correspondence relating to relevant cases decided subsequent to oral argument. On the basis of this entire record, the Court finds that the plaintiffs are not entitled to a preliminary injunction.

## II. THE PARTIES

4. The named plaintiffs in this class action are two non-profit associations of nursing facilities and four individual facilities. Three of the named plaintiff facilities are non-profit facilities: Greenwood House Home for the Jewish Aged, Inc. ("Greenwood House"); Presbyterian Homes of Northern New Jersey, Inc., d/b/a Robert Wood Johnson, Jr. ("Robert Wood Johnson"); and Mega Health Care Center, Inc., d/b/a Llanfair House ("Llanfair House"). The fourth facility, Holiday Medical Center, d/b/a Medicenter of Lakewood ("Medicenter"), is a for-profit facility. The proportion of for-profit and non-profit facilities among the named plaintiffs is not reflective of the industry as a whole; approximately two-thirds of New Jersey nursing homes are for-profit and one-third are non-profit. Hearing Transcript ("Tr.") at 3.84–3.85.

Defendant Alan J. Gibbs ("Gibbs") was the Commissioner of the New Jersey Department of Human Services ("DHS"), the state agency designated pursuant to 42 U.S.C. § 1396a(a)(5) to administer the Medicaid program in New Jersey and the agency which enters into agreements with individual nursing facilities for the provision of services to Medicaid patients. Complaint at ¶ 15. Defendant Kilstein is the Director of DHS, which has day-to-day responsibility for administering New Jersey's Medicaid program. *Id.* at ¶ 16. Defendants are responsible for assuring compliance by DHS with state and federal law. *Id.* at ¶¶ 15–16.

By Memorandum and Order dated March 11, 1991, the Court granted plaintiffs' motion for class certification under *Fed.R.Civ.P.* 23(a) and 23(b)(2). The class is comprised of all proprietary and not-for-profit nursing facilities which render care to beneficiaries of the New Jersey Medicaid program.

## III. *THE FEDERAL MEDICAID PROGRAM*

█ 5. The Medicaid program is a joint federal-state program designed to provide medical assistance to individuals "whose income and resources are insufficient to meet the cost of necessary medical services." 42 U.S.C. § 1396. Although a state is not required to participate in the program, once a state has been accepted into the program it must comply with the Medicaid statute and federal regulations. *Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 2679, 65 L.Ed.2d 784 (1980).

6. Payment rates for nursing facilities are governed by an amendment to the Medicaid Act known as the Boren Amendment. Enacted as part of the Omnibus Budget Reconciliation Act of 1980 ("OBRA '80"), Pub.L. No. 96–499, § 962(a), 94 Stat. 2599, 2650 (1980), the Amendment requires that states pay rates:

> which the State finds, and makes assurances satisfactory to the Secretary [of the Department of Health and Human Services], are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in

conformity with applicable State and Federal law, regulations, and quality and safety standards. . . .

42 U.S.C. § 1396a(a)(13)(A).

7. In 1987, as part of the Omnibus Budget Reconciliation Act of 1987 ("OBRA '87"), Congress enacted extensive nursing home reform legislation. Pub.L. No. 100–203, § 4211, 101 Stat. 1330–186. OBRA '87 mandated that nursing facilities meet numerous requirements relating to patient care, staffing levels and training, facility administration, resident assessment and related plans for care, and residents' rights generally. All of these requirements were designed "to attain or maintain the highest practicable level of physical, mental and psychosocial well-being of each resident." *Id.*, § 4211(a), 100 Stat. 1330–185. States were required to bring their Medicaid programs into compliance with these new requirements no later than October 1, 1990. 42 U.S.C. § 1396r.

8. OBRA '87 also amended the Boren Amendment to require that reimbursement rates for nursing facilities take into account the costs of complying with the specific new staffing and service provisions established by OBRA '87. Pub.L. No. 100–203, § 4211(b)(1)(A), 100 Stat. 1330–203 (1987).

9. In the Omnibus Budget and Reconciliation Act of 1990 ("OBRA '90"), Congress amended the 1987 amendment to the Boren Amendment to specify that states include "the costs of services required to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each Medicaid resident" when taking into account the costs of complying with OBRA '87. Pub.L. No. 101–508, § 4801(e)(1)(A), 104 Stat. 1388–215 (1990). With the addition of the 1987 and 1990 amendments, the Boren Amendment now reads:

> [A] State plan for medical assistance must provide for payment . . . of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State) which, in the case of nursing facilities, take into account the

costs (including the costs of services required to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident eligible for benefits under this title) of complying with subsections (b), (c) and (d) of section 1919 [the nursing home reform provisions of OBRA–87] ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards....

42 U.S.C. § 1396a(a)(13)(A).

10. The Secretary of Health and Human Services has delegated responsibility for administering the Medicaid program to the Health Care Financing Administration ("HCFA"). Under HCFA regulations, and consistent with the Medicaid statute, states wishing to participate in the Medicaid program must submit a "state plan" describing the "methods and standards" by which providers of Medicaid services will be reimbursed. 42 C.F.R. § 447.252(b).

11. In order to receive approval for a state plan, or a change in payment methods and standards, states must submit certain assurances to HCFA. These assurances must be supported by "findings," which need not be submitted to HCFA. However, findings must be made whenever a state changes its methods and standards, and not less often than annually. 42 C.F.R. § 447.253(b). The required finding at issue in this case is one that closely tracks the substantive standard of the Boren Amendment: that payment rates "are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards." 42 C.F.R. § 447.253(b)(1).

12. OBRA '87 required each state to submit a Medicaid plan amendment no later

than April 1, 1990 "to provide for an appropriate adjustment in payment amounts" for services which were required under that statute to be furnished after October 1, 1990. Pub.L. No. 100–203, § 4211(b)(2), 100 Stat. 1330–203 (1987). With respect to the plan amendments required by OBRA '87, the Secretary of Health and Human Services was required "to review" each state's OBRA '87 amendment "for compliance" with the requirements of the Boren Amendment, as amended by OBRA '87, and to approve or disapprove the amendment by September 30, 1990. Id. at 1330–203–204.

## IV. THE NEW JERSEY MEDICAID REIMBURSEMENT SYSTEM

### A. GENERAL CONSIDERATIONS

13. Reimbursement rates for nursing facilities in New Jersey are set using a methodology known as the Cost Accounting and Rate Evaluation ("CARE") system. Kilstein Decl. at ¶ 8. The CARE methodology is codified at N.J.A.C. § 10:63–3.1 et seq. The CARE system is a prospective system, which means that rates are determined in advance of the rate year in which costs are actually incurred. If an individual facility's costs exceed its prospective rate, the facility must absorb the difference; on the other hand, if the facility maintains its costs below its reimbursement rate, it may keep the difference.

14. Under the CARE system, reimbursement rates are recalculated annually on the basis of each facility's prior year costs. Kilstein Decl. at ¶ 14. Facilities must submit cost reports to the Health Facilities Rate Setting Unit of the New Jersey Department of Health within 90 days of the close of their individual fiscal years.[1] The period for which costs are reported is known as the facility's "base period." Base period costs are used in establishing the prospective per diem rates for each facility for the year beginning six months after the end of each facility's base period. N.J.A.C. § 10:63–3.1(a). The six-month gap between the end of the base year and the beginning of the rate year is neces-

---

1. Although DMAHS is ultimately responsible for all aspects of the administration of the Medicaid program, it contracts with the New Jersey Department of Health to perform certain rate-setting activities. Kohler Decl. at ¶ 3.

sary to compile the cost reports, process them and calculate the rates. Tr. at 1.48. For most facilities in New Jersey, the report year is the calendar year, *id.*, and the rate year therefore runs from July 1 to June 30.

15. Cost reports are subjected to a "desk review," a process during which adjustments are made for arithmetical errors, for reclassification of costs from one category to another, or for costs which are clearly unallowable. Tr. at 1.46. The desk review is not designed to remove all costs that might be disallowed in the course of a full field audit. Tr. at 1.106, 3.6, 4.86–4.87; Engquist Written Testimony at ¶ 11.

16. Following the desk review, adjusted data on the cost reports are entered into a computer system known as "CSNURSE;" the CSNURSE system is used to analyze reported costs and calculate limits or screens on the reported base period costs. Tr. at 1.106, 5.7.

17. The CARE system recognizes two broad categories of costs: operating costs and capital costs. Operating costs are reported in 16 separate cost categories. The 16 operating cost categories consist of the following: raw food, non-food general services, legal fees, administrator/management, assistant administrator, utilities, property insurance, maintenance and replacement, nursing compensation, medical director, patient activities, pharmaceutical consultant, non-legend drugs, medical supplies, social services, and oxygen. N.J.A.C. § 10:63–3.1 *et seq.* Limits or "screens" for 10 of the 16 operating cost categories are set at the median cost plus a certain percentage above the median. Kohler Decl. at ¶ 11. The median is defined as that level at which half of the facilities have costs that are higher than the median and half have costs that are lower. Tr. at 1.57. The percentage of the median used to calculate the limit ranges from 110% to 150%, depending upon the cost category. The percentages used for those cost areas where the screen is established solely by a percentage of the median are: assistant administrator (125%); raw food (120%); non-food general services (105%); medical director (110%); medical supplies (150%); patient activities (150%); social services (110%);

non-legend drugs (110%); pharmacy consultant (110%); and oxygen (110%). N.J.A.C. § 10:63–3.1 *et seq.* Limits established using the median are recalculated each year based on the facilities' prior year costs. Kilstein Decl. at ¶ 14; Tr. at 4.36–4.37.

18. In certain cost categories, the State combines the use of a median with other factors in calculating the reasonableness limits. Kilstein at ¶ 16. One such category of particular importance in this case is the nursing cost category, which is discussed in greater detail below.

19. Capital costs are reimbursed by means of a Capital Facilities Allowance ("CFA"). This payment is designed to reimburse facilities for such non-operating capital costs as depreciation, interest or indebtedness, amortization of leasehold improvements, return on equity, and other costs associated with construction, purchase, alteration or leasing of property, buildings, and fixed equipment. Kilstein Decl. at ¶ 32. In contrast to reimbursement for operating costs, the CFA is not calculated on the basis of annually reported costs but rather on the basis of the appraised value of the facility at the time the CARE system was implemented, or in the case of new Medicaid facilities, at the time of the facility's initial Medicaid certification. Kilstein Decl. at ¶ 33.

20. Facilities report depreciation costs even though such costs are not used in calculating the CFA. Double reporting of depreciation costs can occur if a facility includes as a depreciation expense a cost previously reported as a maintenance and replacement cost. Kilstein Decl. at ¶ 36.

21. The State makes several adjustments to reported costs before applying the reasonableness limits. Because of the 18–month lag between the commencement of the report year and the beginning of the rate year, the State adjusts the screened base period operating costs to account for inflation. Kilstein Decl. at ¶ 14. New Jersey's inflation factor has two components: (a) the average hourly earnings of manufacturing employees in New Jersey, which comprises approximately 60% of the factor; and (b) the Consumer Price

Index, which accounts for the remaining 40%. N.J.A.C. § 10:63–3.18.

22. The State also makes adjustments in reported salaries in certain operating cost areas to reflect geographical wage differences. Kilstein Decl. at ¶ 27. In connection with these adjustments, the State has been divided into three salary regions—high, medium and low. Salary costs reported by the facilities are adjusted on the basis of an equalization factor determined by comparing the median salaries for nurses and general services personnel, excluding administrative employees, in each region to the median salaries for each geographical region. Kilstein Decl. at ¶¶ 28–29.

23. Under the CARE system, facilities receive, in addition to a *per diem* rate based on reported Medicaid patient days, payments for "bed-hold." These are full *per diem* payments made to facilities to reserve a bed for up to 10 days for a Medicaid patient who is temporarily transferred to a hospital. Bedhold payments increase facility revenue by an amount roughly equal to 2% of total reported patient days. Kohler Decl. at ¶ 30; Engquist Decl. at ¶ 18.

24. Facilities that incur higher costs because of unique needs can increase their level of reimbursement by applying for a "Schedule C" adjustment. Such adjustments are made to the cost data submitted by facilities that expect to incur increased costs in the prospective year in order to meet new legal requirements or to improve quality of care. Facilities that can demonstrate that their rates are inequitable or inadequate because of unique circumstances may also request a "hardship adjustment." Kilstein Decl. at ¶ 38.

25. The State's screen on nursing costs, which is central to this dispute has three components: (a) a median wage standard; (b) an hourly component; and (c) a 115%

enhancement factor. The median wage standard is determined by adjusting the statewide median wages for nursing personnel to account for geographic variations in wages. *See* N.J.A.C. § 10:63–3.3(a)(1)–(8). Wages are equalized for each of three categories of nursing staff: registered nurses ("RNs"), licensed practical nurses ("LPNs") and nurse aides. The hourly standard is based on mandatory licensure standards for nursing facilities as established by the New Jersey Department of Health ("DOH"). The 115% enhancement factor is designed to permit flexibility in staffing patterns. N.J.A.C. § 10:63–3.8(b)(6); Kilstein Decl. at ¶¶ 17–18.

26. In 1990, after several years of study and deliberation in which the nursing home industry participated, the DOH implemented new nurse staffing requirements which generally increased the number of hours of nursing care required in order for facilities to be licensed by the State. The new licensure standards require an average of 2.5 hours of nursing care per day for each patient.[2] The new regulations also require that 20% of the required nursing hours be provided by LPNs or RNs, with the remaining 80% of nursing time provided by nurse aides. Defs.Exh. 2 at 323. Supplemental nursing hours are added for patients with one or more of seven special conditions known as "acuities." The additional nursing time ranges anywhere from .75 to 1.5 hours, depending on the severity of the condition. Kilstein Decl. at ¶ 21.[3] Patients with more than one acuity receive cumulative additional hours of care for each acuity suffered. Kilstein Decl. at ¶ 21; Defs.Exh. 2 at 333. The supplemental acuity hours are revised every six months to reflect changes in patient needs. Kilstein Decl. at ¶ 22; Tr. at 5.48. Because the new DOH licensure standards generally increased the number of nursing hours required of facilities, they also caused DMAHS to change

---

2. Under the old system, the State recognized three levels of care: skilled nursing ("SNF"), and two intermediate care categories ("ICF–A") and ("ICF–B"). The minimum SNF hours were 2.75 per patient day. The minimum ICF–A and ICF–B hours were 2.5 and 1.25, respectively. The new licensure standards eliminated the three categories in favor of a single hourly standard. Kohler Decl. at ¶ 15.

3. Specifically, the seven special conditions and the additional nursing time designated for each condition are: tracheostomy (1.25), use of respirator (1.25), head trauma stimulation/advanced neuromuscular orthopedic care (1.5), intravenous therapy (1.5), wound care (.75), oxygen therapy (.75), nasogastric tube feedings and/or gastronomy (1.0). Defs.Exh. 2 at 333.

its reimbursement formula so that facilities would be reimbursed for those additional required nursing hours, effective October 1, 1990.

27. As noted above, OBRA '87 required states to submit by April 1, 1990 a plan amendment demonstrating adequate reimbursement for compliance with that statute's new patient care standards. This requirement coincided with implementation by the New Jersey Department of Health of the new mandatory nursing facility licensure standards and the corresponding change in the reimbursement formula. Accordingly, on March 30, 1990, the State submitted written assurances and related information concerning the adequacy of the rates that would result under the revised CARE methodology. Kilstein Decl. at ¶ 10; Defs.Exh. 2. HCFA approved the new plan on September 13, 1990. Kilstein Decl. at ¶ 10; Defs.Exh. 3. Rates calculated under the new system went into effect October 1, 1990. Kohler Decl. at ¶ 7. The change in the hourly standard for calculating nursing reimbursement increased the aggregate annual reimbursement by $14 million. *Id.*

## B. *CALCULATION OF NURSING PAYMENTS*

28. In New Jersey, the nursing cost component accounts for approximately 40% of nursing facility costs. Tr. at 2.4.

29. Unlike most of the other components of its payment system, DHS does not establish a single limit on nursing costs based upon a facility's total nursing costs per patient per day. Rather, DHS applies a series of limits in calculating the maximum payments for nursing services. Tr. at 1.73–1.75. Specifically, there are limits on (i) the maximum number of hours that will be reimbursed, (ii) the proportion of professional or skilled nursing time that will be recognized within the maximum hours reimbursed, (iii) the wage levels that will be recognized for each hour reimbursed, (iv) the categories of wages that will be recognized in computing the wage limits, and (v) the recognition of costs incurred by a facility employing the mandated director of nursing. *Id.*

30. The first limit, *i.e.*, maximum hours reimbursed, uses the minimum hours required to maintain facility licensure in the state as promulgated by DOH. N.J.A.C. § 10:63–3.8(b); Tr. at 1.73–1.74. Specifically, DOH has established a minimum of 2.5 nursing hours per day for each patient in a nursing facility, N.J.A.C. § 8:39–25.2(b), with additional hours allotted for acuities. Tr. at 1.76–1.77. Thus, under the first limit, DHS determines a facility's maximum reimbursable hours by multiplying the number of Medicaid patients by 2.5 and adding the additional hours for acuities. After adding the hours for the acuities, maximum reimbursable hours of nursing care per patient per day are about 2.63. Pl.Ex. 40 (Table 22); Tr. at 1.78.

31. While DHS directly reimburses a maximum of approximately 2.63 hours per patient per day, nursing facilities in New Jersey provide an average of approximately 3.0 hours per patient per day. Pl.Ex. 40 (Table 22); Tr. at 2.6.

32. Under the second limit, the maximum hours of care that DHS will reimburse are divided by staff category. Under the DOH licensure regulations, 20% of the hours must be provided by professional licensed personnel, *i.e.*, RNs and LPNs, and the remaining 80% may be provided by nurse aides. *See* N.J.A.C. § 8:39–25.2(f); Tr. at 1.74. As with total hours, DHS uses these staffing requirements as a ceiling. Tr. at 1.73–1.74. For example, for a patient with no acuities, DHS will recognize a maximum of 2.5 hours of care, with a maximum of 20% of that care, or 30 minutes, provided by licensed personnel.

33. The DOH licensure regulations also require that facilities with more than 150 beds must have at least one RN on duty at all times, whereas facilities with fewer than 150 beds need only have an RN on duty for one eight-hour shift per day. N.J.A.C. § 8:39–25.2(e). DHS likewise uses these requirements as a ceiling on reimbursable RN hours.

34. On average, the combined effect of these staffing ceilings is that maximum reimbursement for nursing, including acuities, is based on the following staffing pattern: RN (.13 hours); LPN (.40 hours); nurse aide (2.10 hours). Pl.Ex. 40 (Table 22). The ac-

tual staffing patterns of facilities in New Jersey are as follows: RN (.50 hours); LPN (.45 hours); nurse aide (1.99 hours). *Id.*

35. The third limit is the hourly wage rate for each staff category. Determination of this limit begins with a calculation of the median wage for such staff category. This figure, as adjusted,[4] is multiplied by 115% to establish the hourly wage rate limit for each staff category. N.J.A.C. § 10:63–3.8(b)6. This amount is further adjusted to account for the salary differential for the geographic region in which the facility is located. N.J.A.C. § 10:63–3.8(b)4.[5] The resulting hourly wage rate in each staff category is multiplied by the maximum nursing hours in that category. The sum of the amounts for each category represents the screen. A facility's payment for nursing services is based on the lower of its actual nursing costs or the screen.

36. The fourth limitation pertains to the treatment of nursing labor obtained on a contract basis. Because of nurse shortages and other factors, facilities periodically obtain nursing services on a contract basis from nursing agencies or "pools" in order to maintain adequate staffing. Lewin/ICF Report at 34–39; Tr. at 1.74.[6] The cost of such contracted labor significantly exceeds the wages paid to salaried staff. *Id.* In calculating the hourly wage rate screen, DHS does not include the hourly amounts reported by facilities for labor obtained on a contract basis from nurse staffing agencies. Tr. at 1.74. DHS does reimburse for contract nursing costs, but the lower rate applicable to salaried nurses.

37. The fifth limitation relates to the costs incurred by a facility in employing a director of nursing. Under DOH regulations, all facilities must have a director of nursing. N.J.A.C. § 8:39–25.1(a). In addition, the State requires that facilities with 150 or more licensed beds have an assistant director of nursing who is an RN. N.J.A.C. § 8:39–25.2(c). As the role of the director of nursing is supervisory, *see* N.J.A.C. § 8:39–25.1, most directors of nursing have only limited direct patient care responsibility. Tr. at 5.17. While facilities are required to have a director of nursing, there is nothing in the calculation of the nursing screen that directly reflects the non-patient care portion of this cost. Tr. at 1.75. Accordingly, the computation of maximum reimbursable hours under the nursing screen does not account for the mandatory, or non-patient care, duties performed by the director of nursing. *Id.*

Based on the five limitations applied to the nursing cost center, plaintiffs assert that only 20–35% of facilities receive payments for nursing services that are adequate to cover their nursing services costs. *See, e.g.,* Pl.Ex. 6 (Part III, Section 3c, Table 1); Defendants' Exhibit ("Def.Ex.") 11; Tr. at 5.48–5.49; Lewin/ICF Report at 58.

## C.  *THE ADVISORY STANDARDS FOR NURSE STAFFING*

38. In addition to the minimum hours required for licensure, the DOH regulations also contain "Advisory Standards" for nurse staffing. N.J.A.C. § 8:39–26.1 *et seq.* The preamble to the proposed DOH staffing regulations identified the Advisory Standards as a "major innovation of licensure reform." 20 N.J.R. 469(a), 470 (1988). The standards "are intended to ... [e]ncourage facilities and their staff to do more than merely meet minimal standards in providing care to patients." *Id.* While the Advisory Standards for nursing contain several elements, as a general matter, nursing hours per patient per day are 10% higher than under the minimum standards (*i.e.,* 2.75 hours v. 2.5) and assign a higher proportion of that time to licensed nursing personnel (*i.e.,* 30% v. 20%). Under the Advisory Standards, a patient would receive at least 50 minutes per day of

---

4. The median hourly wage rate is adjusted to account for hours paid but not worked (*i.e.,* vacations, sick leave, and the like). N.J.A.C. § 10:63–3.8(b)2.

5. The three salary regions used by DHS, high, medium and low, are based upon 1970 census data. The hourly salary rate is adjusted upward for the high (3.0%) and medium (2.6%) regions and downward (-6.6%) for the low region. N.J.A.C. §§ 10:63–3.3(a)4 and 5; Lewin/ICF Report at 50; Tr. at 1.125.

6. *See generally* Pl.Ex. 10–14 (affidavits of the named plaintiff facilities).

professional nursing time as opposed to the 30 minutes provided under the minimum standards. The "unit staffing" Advisory Standard would further increase the recommended amount of professional nursing time. *See* N.J.A.C. § 8:39–26.3(e). Facilities in New Jersey on average provide about 59 minutes of professional nursing time per patient per day. Pl.Ex. 40 (Table 22).

### D. *INFLATION ADJUSTMENTS*

39. DHS uses an inflation factor to adjust the prospective rates (excluding certain capital items) from the midpoint of the base (cost reporting) period to the midpoint of the rate year.[7] The inflation factor used by the State is based upon a weighted calculation of two indices:

(1) Average hourly earnings of manufacturing employees in New Jersey as published by the Bureau of Labor Statistics (weighted at 60%); and

(2) The Consumer Price Index as published by the Bureau of Labor Statistics (weighted at 40%).

N.J.A.C. § 10:63–3.18; *see generally* Manard Affidavit at ¶¶ 1–5.

### V. *PRELIMINARY INJUNCTION STANDARDS*

40. Under relevant Third Circuit precedent, a district court must consider four factors in ruling on a motion for preliminary injunctive relief. Initially, "the moving party must demonstrate *both* a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir.1987) (emphasis in original). In addition, when relevant, the Court should consider the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. *Id.; Hoxworth v. Blinder Robinson & Co., Inc.*, 903 F.2d 186, 197–198 (3d Cir.1990). "Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary injunctive relief should an injunction issue." *Opticians Ass'n of America v. Independent Opti-*

*cians of America*, 920 F.2d 187, 192 (3d Cir.1990); *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987).

41. Plaintiffs allege that defendants have violated both procedural and substantive provisions of the Boren Amendment. *See generally, Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). The substantive provisions entitle providers to rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities in order to provide care and services in compliance with state and federal standards. *Id.* The procedural provisions entitle providers to enforce the State's obligation to make the assurances and findings required by the Boren Amendment. Plaintiffs contend that the State has violated both of these rights, entitling them to preliminary injunctive relief.

### VI. *DEFENDANTS' COMPLIANCE WITH THE PROCEDURAL PROVISIONS OF THE BOREN AMENDMENT*

### A. *The Procedural Law*

42. As noted *supra*, the Medicaid statute and its implementing regulations require a state Medicaid agency to make findings regarding the adequacy of nursing facility payment rates whenever the state agency amends its methods and standards, but not less often than annually. 42 U.S.C. § 1396a(a)(13)(A); 42 C.F.R. § 447.253(b). The state is required to submit assurances to the Secretary only when it makes a change in its payment methods or standards. 42 C.F.R. § 447.253(a).

43. In *AMISUB (PSL) v. State of Colorado Department of Social Services*, 879 F.2d 789 (10th Cir.1989), the Tenth Circuit first articulated what has now become the accepted test for procedural compliance under the Boren Amendment. The State must, at a minimum, make findings which identify and determine: (i) efficiently and economically operated facilities; (ii) the costs that must

---

7. Since a prospective rate is based upon costs incurred in a prior period, it is necessary to adjust the rate to account for inflation between the time when the costs were incurred and the time when the rate, based upon those costs, is actually paid. Tr. at 1.48.

be incurred by such facilities; and (iii) payment rates which are reasonable and adequate to meet the costs of efficiently and economically operated facilities. *AMISUB*, 879 F.2d at 796, *see also Nebraska Health Care Ass'n v. Dunning*, 778 F.2d 1291, 1294 (8th Cir.1981), *cert. denied* 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987); *Missouri Health Care Association v. Stangler*, 765 F.Supp. 1413, 1415 (W.D.Mo.1991). The Third Circuit approved this formulation of the procedural standard in *Temple University v. White*, 941 F.2d 201, 209, n. 10 (3d Cir.1991).

44. The Supreme Court has recognized the critical importance of the Boren Amendment's · "findings" requirement, noting that such findings are "a necessary prerequisite to the subsequent requirement that the State provide 'assurances' to the Secretary." *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 512, 110 S.Ct. 2510, 2519, 110 L.Ed.2d 455 (1990); *see also Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1314 (2d Cir.1991) ("although procedural requirements may reduce some of the state's 'flexibility' in determining their own schemes of reimbursement, this is what the plain language of the statute requires").

■ 45. While the State is free to create its own method for arriving at the required findings, this does not absolve the State from its obligation to make findings. *AMISUB*, 879 F.2d at 797 ("[m]ere recitation of the wording of the federal statute is not sufficient for procedural compliance"); *see also Wilder*, 496 U.S. at 516–21, 110 S.Ct. at 2522–23 (State must judge the reasonableness of its rates against the objective benchmark of an efficiently and economically operated facility); *Temple University*, 941 F.2d at 209 (finding that State failed to satisfy procedural duties based on failure to conduct "empirical analysis" using objective criteria).

46. The procedural requirements of the federal regulations are satisfied if the State has engaged in a *"bona fide* finding process" and has made assurances to HCFA based upon its findings. *See AMISUB*, 879 F.2d at 797; *Folden v. Washington State Department of Social and Health Services*, 744 F.Supp. 1507, 1532 (W.D.Wash.1990), *aff'd*

981 F.2d 1054 (9th Cir.1992). The State's findings are not proper if the process, rather than being *bona fide* and objective, is merely an exercise to make the best case to support the State's rates, and the State considers only factors favorable to its position while failing to consider relevant factors that are unfavorable. *See Multicare Medical Center v. State of Washington*, 768 F.Supp. 1349, 1392 (W.D.Wash.1991); *California Hosp. Ass'n v. Schweiker*, 559 F.Supp. 110, 117 (C.D.Cal.1982), *aff'd*, 705 F.2d 466 (9th Cir. 1983); *Wilder*, 496 U.S. at 516–21, 110 S.Ct. at 2522–23.

■ 47. It is important· with respect to the procedural challenge to understand Congress' purposes in enacting the Boren Amendment. In addition to fostering cost-containment, the other principal purpose of the statute was to "reduce potentially stifling and expensive federal oversight of state methodologies." *West Virginia University Hospitals*, 885 F.2d 11, 23 (3d Cir.1989). Under the Boren Amendment, states were to have "considerable freedom in pursuing ways of limiting Medicaid costs," *id.* at 23, with the federal role limited to the "minimum necessary to assure proper àccountability." S.Rep. No. 139, 97th Cong., 1st Sess. 478 (1981), *reprinted in* 1981 U.S.Code Cong. & Adm.News 396, 744. HCFA has confirmed that Congress expected the agency to "develop regulations that would increase states' discretion in setting payment rates, and would employ a federal review process which would be less administratively burdensome." 48 Fed.Reg. 56047 (Dec. 19, 1983).

48. Consistent with these purposes, the Boren Amendment does not require a formal, detailed or technical findings process. The State is free to create its own method of findings. *AMISUB*, 879 F.2d at 797. Indeed, the findings process does not require any special studies or even written findings. *Colorado Health Care Ass'n v. Colorado Department of Social Services*, 842 F.2d 1158, 1168 (10th Cir.1988); *Massachusetts Federation of Nursing Homes*, 772 F.Supp. 31, 40 (D.Mass.1991); *Folden*, 744 F.Supp. at 1532, 1534; *Mary Washington Hospital, Inc. v. Fisher*, 635 F.Supp. 891, 899 (E.D.Va.1985). Such a requirement would be entirely incon-

sistent with congressional intent not to over-burden the states with cumbersome and excessive paperwork requirements. *Massachusetts Federation of Nursing Homes,* 772 F.Supp. at 40; *West Virginia Univ. Hosp.,* 885 F.2d at 23.

■ 49. Under the informal and flexible findings procedures contemplated by Congress and HCFA, "[i]t is sufficient if [the State] has considered, on the basis of some reasonably principled analysis, whether its payment rates meet the substantive requirements of the Boren Amendment." *Folden,* 744 F.Supp. at 1532; *Massachusetts Federation of Nursing Homes,* 772 F.Supp. at 37; *Thomas v. Johnston,* 557 F.Supp. 879, 910 (W.D.Tex.1983). Such a reasonably principled analysis must "establish a nexus between the costs of operating efficient and economic nursing facilities and the proposed reimbursement rates under the state plan." *Pinnacle Nursing Home v. Axelrod,* 928 F.2d at 1314.[8]

### B. *The Findings Requirement*

■ 50. As noted above, the Boren Amendment requires states to submit certain assurances to HCFA which must be supported by findings that the rates comply with the statute's substantive standard. Plaintiffs allege that New Jersey failed to satisfy these procedural requirements. In particular, they allege that the State failed to make the requisite findings so that the assurances, although concisely filed with HCFA, were invalid.

51. Defendants admitted in their answers to interrogatories that DHS has not formulated a definition of an efficiently and economically operated facility. *See* Pl.Ex. 9. Furthermore, in responding to plaintiffs' discovery requests, defendants did not produce any tangible evidence of DHS findings in the form of empirical analyses which specifically addressed the overall adequacy of defendants' Medicaid rates. However, during the course of the instant litigation, defendants have described in detail the process by which DHS made its federally-required findings of compliance with the Boren Amendment in terms of the kinds of data collected and evaluated by the State during its findings process. *See* Kohler and Kilstein Decls.

52. The principal tools in New Jersey's findings process are the annual median runs. Kilstein Decl. at ¶¶ 13–18; Kohler Decl. at ¶¶ 9–11. At the heart of New Jersey's complex reimbursement scheme is the presumption that facilities incurring costs below the median in individual cost centers are those that are efficient and economical in those areas. Kilstein Decl. at ¶¶ 13, 15.[9] Although defendants do not have an explicit definition of economic and efficient facilities, the State deems as economic and efficient facilities at least those facilities that are able to keep costs below the costs incurred by half of the facilities in each cost category. Kilstein Decl. at ¶¶ 13, 15; Tr. at 5.8. Significantly, the experts for both parties in this case agree that it is proper for a state to assume that efficient and economically operated facilities are those below the median in terms of costs. Tr. at 1.40, 4.39.

### C. *The Adequacy of New Jersey's Procedure*

53. Defendants' expert witness testified that the State uses the reasonableness screens themselves to identify the costs of efficiently and economically operated facilities. Tr. at 5.8. Plaintiffs argue that such reasoning is circular and does not represent a "finding" which is based on objective criteria.[10]

---

**8.** This Court is aware that another district court has indicated that states must make "formal" findings supported by "formal" studies. *Rye Psychiatric Hospital Center, Inc. v. Surles,* 768 F.Supp. 82 (S.D.N.Y.1991). This Court declines to follow this case because the weight of authority cited in the text clearly holds that neither formal findings nor formal studies are required.

**9.** In areas such as nursing, the State evaluates additional information as well. Kohler Decl. at ¶¶ 12–18.

**10.** It is appropriate to note at this point that plaintiffs rely, in part, upon the decision in *Tioga Pines Living Center, Inc. v. Indiana Dept. of Public Welfare,* No. 30C01–9002–CP–125 (Indiana Cir.Ct., Sept. 18, 1991 (judgment) and Sept. 19, 1991 (findings and conclusions)), rendered by the Hancock County Circuit Court of Indiana, in

54. In New Jersey, the State does not base its findings on the fact that the system pays what the State has determined in advance that it should pay. Instead, the rate-setting methodology, by identifying facilities below the median in terms of cost, contains an objective mechanism for identifying efficiently and economically operated facilities with respect to each cost category. Under the New Jersey system, the identification of efficiently and economically operated facilities is closely tied to, and indeed constitutes an integral part of, the rate-setting process.

55. In light of plaintiffs' expert's testimony, based upon her extensive practical experience, that it is difficult, if not impossible, to identify and determine efficient and economic facilities with precision, *see* Tr. at 1.56, 1.65, 2.99, 2.116, the Court is reluctant to conclude that a state plan must identify, by name or by some identifying characteristic other than its costs relative to the costs of its peers, those facilities that are efficiently and economically operated. As noted by both the district court and the Ninth Circuit in *Folden*, "HCFA has specifically rejected the suggestion that states should be required to define efficiently and economically operated facilities, because 'the State's methods and standards implicitly act as the State's definition of an efficiently and economically operated facility.'" *Folden*, 981 F.2d 1054, 1057–1058, *quoting* 744 F.Supp. at 1532. The *Folden* court unequivocally rejected plaintiffs' contention "that the State is required to set up a model of an efficiently and economically operated facility and then match the cost of all facilities against that model." *Folden*, 981 F.2d at 1057. The Court rejects plaintiffs' contention in the instant case that New Jersey must establish or designate a "gold star" facility against which all New Jersey facilities must be measured; such a process is neither a requirement of the Boren Amendment nor a requirement of *AMISUB*. As noted *supra*, *AMISUB* required only that "the State Medicaid Agency, *at a minimum*, ... make findings which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and, (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals." *AMISUB*, 879 F.2d at 796 (emphasis in original). "It is important to recognize that the *AMISUB* decision does not require *definition*, but only *identification* and *determination* of such facilities." *Folden*, 744 F.Supp. at 1532 (emphasis in original). An automobile's efficiency and economy is evaluated by comparing its costs of operation with those of other automobiles; a person's efficiency can be evaluated by comparing output with time expended, in relation to that of his/her peers; no different analysis can be expected with respect to nursing facilities.

■ 56. Furthermore, "there is a presumption that a state will engage in a *bona fide* finding process before it makes assurances to HCFA that the required findings have been made." *AMISUB*, 879 F.2d at 797; *Folden*, 744 F.Supp. at 1533. Plaintiffs must come forward with "credible evidence to overcome the presumption that the State engaged in a *bona fide* finding process." *Folden*, 744 F.Supp. at 1533.

57. Plaintiffs' assertion that the State failed to make proper findings is based upon

support of their contention that New Jersey's rate-setting methodology is "circular." *See* Plaintiffs' Proposed Findings at ¶ 68. Defendants vigorously challenge the precedential value of the *Tioga Pines* decision. *See, e.g.,* Defendants' Response to Plaintiffs' Proposed Findings at ¶ 50; Defendants' Correspondence dated November 4, 1991 at 1–7.

The Court notes that the Indiana Court of Appeals twice has reversed the trial court in that case on matters unrelated to the merits. *See, Metropolitan Board of Zoning Appeals v. Avis*, 575 N.E.2d 33 (Ind.App. 4 Dist.1991), *Indiana Board of Public Welfare v. Tioga Pines*, 592 N.E.2d 1274 (Ind.App. 1 Dist.1992). In any event, the Court

has considered *Tioga Pines* and concludes that the issues as to which plaintiffs rely on that case have been treated by several federal courts that this Court determines to be substantially more authoritative. *See, e.g., Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, ·110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (discussing standard of review); *Temple University v. White*, 941 F.2d 201 (3d Cir.1991) (discussing, *inter alia,* substantive requirements under the Boren Amendment); *Folden v. Washington Dept. of Social Services*, 744 F.Supp. 1507 (W.D.Wash.1990), *aff'd,* 981 F.2d 1054 (9th Cir.1992) (discussing, *inter alia,* reimbursable costs, depreciation and procedural requirements under the Boren Amendment).

the State's admission that it did not have a definition of an efficiently and economically operated facility. This "admission," without more, does not establish non-compliance because federal law does not require states to define efficient and economically operated facilities. *Folden,* 744 F.Supp. at 1532. Indeed, HCFA specifically rejected the suggestion that its regulations require states to develop such a definition. 48 Fed.Reg. 56049 (Dec. 19, 1983). In HCFA's view, "no explicit definition is necessary" because "the state's methods and standards implicitly act as the state's definition of an efficiently and economically operated facility." *Id.* As the federal agency responsible for administering the Medicaid statute, HCFA's interpretation of the statute is entitled to deference from the courts. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

58. Plaintiffs also contend that the Court should find in their favor because defendants have not produced a specific "findings" document. This argument is rejected because, as noted *supra,* the absence of a specific "findings" document is not dispositive, as states are not required to make their findings in writing. *See, Colorado Health Care Ass'n,* 842 F.2d at 1168; *Massachusetts Federation of Nursing Homes,* 772 F.Supp. at 40; *Folden,* 744 F.Supp. at 1532, 1534; *Mary Washington Hospital,* 635 F.Supp. at 897.

59. Additionally, it is clear from the Kilstein and Kohler Declarations that the relevant officials considered information in addition to the median runs that are generated in the operation of the rate-setting methodology. This information included special studies conducted in response to identified problems, information received from the facilities and developed by the State during the State administrative appeals process, other information provided by the industry through formal and informal contacts, information available from other state agencies regarding relevant matters such as industry health, patient access to care, and information regarding the quality of care. Kohler Decl. at ¶ 6. This is therefore not a case like *Temple University v. White,* 941 F.2d 201, 208–209 (3d Cir.1991),

or *West Virginia University Hospitals v. Casey,* 885 F.2d 11, 30 (3d Cir.1989), where the defendants failed to collect data or to make findings at all.

60. The State also evaluated studies that demonstrated a low cost-rate ratio. In January 1990, as part of a petition for rulemaking, the nursing home industry filed a cost-rate analysis that indicated results similar to those found by plaintiffs' expert in her subsequent study prepared for this litigation. *See* Plts.Exh. C. However, the State determined that the study presented by the nursing facility industry was not reliable evidence of deficiencies in the reimbursement methodology. Kohler Decl. at ¶¶ 24–32.

61. A formal State study of nursing costs conducted in 1989 also revealed that many facilities had costs above the screen. Examination of the data upon which this study was based demonstrated that the primary reason for facilities incurring costs above the screen was the presence of nursing hours far in excess of the required number. Kohler Decl. at ¶ 13. The State also believed that it was addressing any legitimate concerns raised by this study because it was about to increase the number of nursing hours to be reimbursed and because it had recently injected an additional $15 million into the rates of high Medicaid occupancy facilities in order to enable them to meet temporarily higher nursing costs. Kohler Decl. at ¶¶ 13–14; Kilstein Decl. at ¶¶ 40–41.

62. Presumably, the procedural "findings" requirement would be met had New Jersey incorporated in the plan something like the following:

> The state finds that an efficiently and economically operated nursing facility is one whose costs are at or below the median of costs incurred by nursing facilities generally in the following relevant categories.... The State further finds that costs must be incurred if they are in fact incurred in each category of cost by the lower-cost half of the facilities. We further find that the DOH licensure standards are adequate to provide legally-mandated levels of care.

All of the foregoing is implicit in the New Jersey methodology. The Court does not

believe that Congress intended that findings which are implicit in a state's Medicaid reimbursement methodology must be set out separately or in some particular format, and, given the dire consequences of invalidating a state plan, the Court is reluctant to impose such a requirement. Such a requirement would be inconsistent with Congress' expressed intent to relieve the states of burdensome administrative requirements, and in any event could have been specified if Congress (or HCFA) had wished to impose this requirement on the states.

63. Moreover, as discussed in detail *supra*, the Court's concern over the scope of the "findings" requirement is largely resolved by the holding in *Folden* that the process of identification and determination called for in *AMISUB* may be accomplished through the terms of the state plan itself. *Folden*, 744 F.Supp. at 1533, *aff'd* 981 F.2d at 1057.

64. Plaintiffs bear the burden of coming forward with evidence demonstrating a substantial likelihood that they can prove a procedural violation of the Boren Amendment. This they have failed to do. Given the flexibility that the Boren Amendment affords states in devising their findings process, the Court cannot say that New Jersey has been arbitrary or capricious in evaluating efficiency and economy, in part, on a component-by-component basis. The defendants' system of identifying economic and efficient facilities is thus implicit in the rate methodology. It is also inherent in the methodology that facilities whose costs are below the median in a particular cost category will receive reimbursement for costs in that category. There is nothing circular about this process. Therefore, the State appears to have done all that the law requires to identify and determine efficiently and economically operated facilities and the costs that must be incurred by such facilities. Because the reimbursement formula ensures that facilities will receive reimbursement for costs below the medians in the various cost categories, the State is justified in finding that its rates are reasonable and adequate to meet the costs incurred by efficiently and economically operated facilities. On its face, the evidence presented by the State appears to demonstrate substantial compliance with the procedural standard of the Boren Amendment.

## VII. DEFENDANTS' COMPLIANCE WITH THE SUBSTANTIVE REQUIREMENTS OF THE BOREN AMENDMENT

### A. The Substantive Challenge

65. As noted *supra*, plaintiffs' allegations, as presented by their expert, deal primarily with defendants' method of calculating reimbursable nursing costs. Plaintiffs assert that analysis of the DHS payment methodology demonstrates that the Medicaid rates paid to nursing facilities by New Jersey are inadequate and that the majority of facilities purportedly receive Medicaid payments lower than their actual allowable costs. Plaintiffs also allege that the overall rates paid under the New Jersey system are inadequate, primarily because only a small percentage of facilities receive 100% of what they deem to be their allowable costs. As indicated above, defendants impose certain limitations on those costs in the course of setting the screens, or limits, on reimbursement; plaintiffs challenge the reimbursement system itself insofar as it contains what plaintiffs' expert regards as an inordinate number of restrictive separate limits. Plaintiffs also challenge the inflation factor that is applied to all costs, the geographical wage adjustment methodology, the failure to include the costs of contract nursing in calculating the nursing screen and the nursing screen itself. Each of these challenges will be considered separately.

### B. The Experts and their Roles

66. Plaintiffs rely upon a study conducted by their expert, Barbara B. Manard, Ph.D. Dr. Manard is a Vice President of the health care consulting firm of Lewin/ICF, Inc. Her findings and conclusions are set forth in her affidavit and the attached report ("Lewin/ICF Report") and were described in detail in her hearing testimony. *See generally,* Tr. at 1.35–3.128; 5.70–5.117.

67. Dr. Manard has a broad range of experience in the design and analysis of Medicaid rate setting systems for nursing facili-

ties, including assistance to states and the federal government on Medicaid rate setting matters. Tr. at 1.37–1.38. The Court has accepted Dr. Manard as an expert in this case.

68. Defendants' expert is Dr. Gretchen Engquist, a principal in the Compass Group of KPMG Peat Marwick, specializing in health policy development and evaluation. Like Dr. Manard, she has a broad range of experience in the design and analysis of Medicaid rate setting systems for nursing facilities, including assistance to states on Medicaid rate setting matters. She has served as the director of the Medicaid program for the State of Missouri. Tr. 3:129–130. The Court also has accepted Dr. Engquist as an expert in this case.

69. Neither expert has purported to address directly the legal question of the State's compliance with the Boren Amendment. On the contrary, they have eschewed reference to legal authorities or doctrines and have appropriately confined their analyses primarily to the impact on nursing facilities of the State system and their respective views as to the considerations and methodology which are appropriate in the design of Medicaid reimbursement systems.

#### C. *Presumption of Validity*

70. Initially, defendants note that New Jersey's current plan was approved by HCFA in September, 1990; defendants assert that the Court must therefore accord to the State's Medicaid plan a presumption of validity, because, "as a general rule, HCFA approval of a state plan indicates state compliance with applicable statutes and regulations." *Massachusetts Federation of Nursing Homes, Inc. v. Commonwealth of Massachusetts,* 772 F.Supp. 31, 39 (D.Mass.1991). The Court notes that the rationale underlying this presumption relates to the fact that "HCFA certainly has more expertise in this complicated area of the law than the courts." *Id.*

71. However, in light of the Third Circuit's recent decision in *Erie County Geriatric Center v. Sullivan* that, "[to] be satisfied with a state's assurance that its method for determining reimbursement rates results in

reasonable and adequate reimbursement to eligible facilities as required by the Medicaid Act, the Secretary must be convinced that a state has made findings that its rates do in fact provide such reimbursement," *Erie County,* 952 F.2d 71, 81–82 (3d Cir.1991); and HCFA's litigation position in that case that the Secretary need "focus simply on the state's assurances of compliance without examining the bases underlying these assurances," *id.* at 79, the Court declines to extend any such presumption of validity to HCFA's approval of New Jersey's plan in the instant case. Given the Secretary's erroneous interpretation of his obligations with respect to state plans until the decision in *Erie County* in 1991, the Court concludes that it is unlikely that HCFA gave anything other than perfunctory consideration to the New Jersey plan. The Court therefore finds that a presumption of validity based solely on the cursory HCFA approval is unwarranted.

#### D. *The Cost–Rate Analysis*

72. For purposes of determining whether New Jersey's overall reimbursement rates fall within the range of reasonableness prescribed by the Boren Amendment, it is the entire reimbursement methodology taken as a whole that is relevant, not the individual components that comprise the rate. *See Colorado Health Care,* 842 F.2d at 1167; *Folden,* 744 F.Supp. at 1535. This is because "even if payments in one cost center are less than reasonable and adequate, there may be no violation of the Boren Amendment because the proper analysis under the Amendment focuses on the total rate." *Folden,* 744 F.Supp. at 1535. The fundamental inquiry regarding compliance with the Boren Amendment's substantive standard is whether the rates, overall, are adequate to meet the costs that must be incurred by efficiently and economically operated facilities in serving Medicaid patients. *Id.*

73. While New Jersey's rate methodology is complex and multifaceted, the primary consideration in resolving plaintiffs' cost-rate challenge is whether the actual rates paid by the New Jersey Medicaid program are, in fact, reasonable and adequate.

*See generally, Kansas Health Care Ass'n v. Kansas DSRS,* 754 F.Supp. 1502, 1512–1515 (D.Kan.1990); *Folden,* 744 F.Supp. at 1534–1537. Plaintiffs argue that objective analyses of the DHS payment methodology demonstrate that the Medicaid rates paid to nursing facilities are not adequate because the overwhelming majority of facilities receive Medicaid reimbursement payments lower than their actual allowable costs; defendants disagree and further assert that the State's multi-component rate-setting methodology is reasonable in design and thus satisfies the Boren Amendment. For the reasons enumerated below, the Court concludes that plaintiffs have not demonstrated a reasonable likelihood of success on the merits of this substantive claim.

74. The parties have submitted to the Court extensive and extraordinarily detailed statistical analyses, as well as rebuttal and surrebuttal analyses, regarding the adequacy of the New Jersey reimbursement scheme. The divergent methodologies employed by the experts in this case reflect the differing positions of the parties as to precisely what the substantive provisions of the Boren Amendment require of a state's Medicaid reimbursement plan.

75. Defendants assert initially that the appropriate standard for reviewing the New Jersey plan is that articulated in *West Virginia University Hospitals,* where the Third Circuit stated, "[w]hat matters ... is whether the reimbursement rates to [facilities] *in the aggregate* are arbitrary and capricious." *West Virginia University Hospitals,* 885 F.2d at 26 (emphasis added). Defendants thus conclude that the relevant analysis for determining whether New Jersey's rates fall within the range of reasonableness and therefore comply with the Boren Amendment should consist of a comparison between the industry's aggregate costs and the aggregate reimbursement provided by the State. Defendants assert that, under plaintiffs' method of calculation, New Jersey reimburses 86.3% of the aggregate costs incurred by Medicaid providers. On its face, this figure appears to the Court to be an impressive percentage that may preclude the Court, at this preliminary stage of the litigation, from finding in plaintiffs' favor. As noted *supra,*

rates will comply with the Boren Amendment if they fall within a range of reasonableness. The Court is reluctant to conclude that a reimbursement system·that, under plaintiffs' own method of calculation, reimburses 86.3% of the industry's aggregate costs is outside the range of reasonableness, particularly when it is clear that Congress did not intend the Boren Amendment to require payment of all costs by a state. It appears neither arbitrary nor capricious to assume at this preliminary stage that 13.7% of the aggregate costs are unnecessary costs for which the State is not required to provide reimbursement under the Boren Amendment.

76. Moreover, and as will be discussed in greater detail *infra,* in connection with plaintiffs' cost-rate calculations and defendants' rebuttal thereof, defendants' modifications to plaintiffs' calculations yield an aggregate reimbursement rate of at least 97.4% of costs.. Under defendants' methodology, plaintiffs' costs are adjusted to eliminate certain categories of unnecessary costs for which the State is not required to provide reimbursement; defendants' figure does not include any adjustment for "outliers" or for new facilities. While the Court does not agree with every assumption made by the State's expert in computing this figure, it remains clear that New Jersey reimburses a substantial proportion of the facilities' aggregate costs, and in no event less than 86.3%. Further analysis not attempted on the record currently before the Court would provide insight into whether the remaining 13.7% of costs must be incurred by efficiently and economically operated facilities.

77. Additionally, the Court notes that both experts agreed that it is appropriate to examine the experience of lower-cost facilities, which tend to be more efficiently and economically operated than the higher-cost facilities. Tr. at 1.40, 2.80; Engquist Written Testimony at ¶ 19. Accordingly, both experts presented charts which separate the providers into four quartiles from lowest to highest in terms of costs.

78. Using Dr. Manard's numbers, without the adjustments to costs made by defendants' expert, 99.3% of the aggregate costs of providers in the lowest cost quartile are reim-

bursed; 88.9% of the aggregate costs of providers in the second lowest cost quartile are reimbursed; 84.9% of the aggregate costs of providers in the third lowest cost quartile are reimbursed; and 74.7% of the aggregate costs of providers in the highest cost quartile are reimbursed. Defs.Exh. 44.. With the cost adjustments made by defendants' expert, discussed in detail *infra*, these percentages become 107.9%, 99.8%, 97.2% and 88%, respectively. Defs.Exh. 43. Under either approach, the very high levels of aggregate reimbursement for providers in the lowest quartile—*i.e.*, those who are presumptively the most efficient—make the Court reluctant to conclude that plaintiffs have carried their burden of showing a reasonable likelihood of success on the merits.

79. Plaintiffs assert that defendants have misconstrued the meaning of the term "aggregate" as employed by the Third Circuit in *West Virginia*. Plaintiffs argue that *West Virginia* "is a very unusual Boren Amendment case since it did not involve an overall challenge to the state's rate setting methodology for hospitals. In fact, notwithstanding the finding in [*West Virginia*] that average rates covered 95% of costs for in-state hospitals, the Pennsylvania hospital plan was in fact the focus of subsequent litigation (brought by in-state hospitals) which found that the state had failed to satisfy the procedural requirements of the Boren Amendment." Plaintiffs' Response to Defendants' Proposed Findings of Fact at 11.

80. The Court agrees with plaintiffs' characterization of *West Virginia* as a "very unusual Boren Amendment case" whose facts differ from those of the instant case in several significant respects. It also appears clear that the unique facts of *West Virginia* in large part compelled the comparison between that plaintiff's single facility and the class of in-state hospitals through the analysis of average aggregate costs reimbursed. However, the Court is unwilling to discount entirely the aggregate comparison methodology em-

ployed by defendants, as plaintiffs propose. The Court notes that the indisputable purpose of the Medicaid Act and its subsequent amendments was to ensure that facilities are adequately reimbursed for their necessary expenditures; few statistics can demonstrate compliance with this congressional mandate more clearly or forcefully than figures comparing total reimbursable costs of facilities with total reimbursement by the State. While such a comparison necessarily embodies some degree of imprecision and some measure of *post hoc* justification, it also represents an unambiguous scorecard demonstrating the success or failure of the system as a whole.[11] The figures currently before the Court demonstrate considerable success on the part of the New Jersey reimbursement system indicating that plaintiffs are unlikely to succeed on the merits of this claim.

81. Dr. Manard testified that it is inappropriate to evaluate aggregate reimbursement against aggregate costs. Tr. at 3.124–27. The evidence before the Court, however, demonstrates that Dr. Manard's reasons for rejecting a comparison of aggregate costs to aggregate reimbursement are largely unfounded. She contends that the aggregate analysis does not adequately address the distribution of reimbursement between high and low cost facilities, and fears that under an aggregate analysis, a system that reimbursed high-cost providers more generously than low-cost providers could pass muster. Tr. at 3.124–3.127. However, as noted above, Dr. Engquist's quartile analyses of aggregate costs and reimbursement demonstrate that the lowest cost facilities are receiving the highest percentage of cost coverage and the highest cost facilities are receiving the lowest percentage. Defs.Exhs. 44 & 45. In the Court's opinion, these tables adequately address Dr. Manard's concern over the distribution of payments.

82. Accordingly, the Court concludes that consideration must be given to defendants'

---

11. The Court does not hold, nor does it mean to suggest, that a state system designed in advance to reimburse only 86% of the industry's aggregate costs satisfies the Boren Amendment. Instead, the Court merely finds that the validity of New Jersey's carefully constructed reimburse-ment plan, which provides for enhancement factors and annual rebasing, may be analyzed in part with respect to the percentage of aggregate industry costs reimbursed under the State's system.

"aggregate cost" methodology as relevant, although not determinative, evidence tending to support the Court's independent conclusions on the issue of. New Jersey's substantive compliance with the Boren Amendment, discussed below. This methodology indicates that an exceptionally high percentage of the industry's aggregate costs, in no event less than 86.3% and almost certainly higher, are reimbursed by the State; while the Court cannot resolve at this time whether such costs must be incurred by efficiently and economically operated facilities, the Court concludes that the aggregate cost analysis is both relevant and detrimental to plaintiffs' attempt to demonstrate a likelihood of success on their substantive challenge to New Jersey's system.

83. Plaintiffs argue that the proper approach for analyzing New Jersey's compliance with the Boren Amendment is "to use allowable costs as reported and to determine the proportion of facilities receiving reimbursement of their full allowable costs." Plaintiffs' Proposed Conclusions of Law at ¶ 34. According to plaintiffs, "this method of analysis evaluates what is occurring in the real world by measuring the normative behavior of facilities." *Id.* Dr. Manard performed a rate analysis based upon the foregoing method.

84. At the hearing, Dr. Manard explained that her rate analysis is based upon three fundamental principles. Tr. at 1.40. The first is that the lower-cost homes can be used as a proxy for the economically and efficiently operated facilities. *Id.* The second principle is that the more refined a system is in accounting for factors which legitimately cause costs to vary among facilities, the lower a state may set its limits. Tr. at 1.41. The third principle is that, because rate setting is an imprecise science, it is advisable to err on the side of allowing higher costs for direct patient care, because of the relationship to quality, and to use more stringent limits for indirect care. Tr. at 1.41.

85. Dr. Manard expressed her belief that in determining whether the State plan meets the Boren Amendment standard, it is appropriate to consider the benchmark test of whether Medicaid rates are adequate to cover the total allowable costs of 50% of facilities. Tr. at 5.78. It appears that the State also generally evaluates efficiency based on whether "at least half of the facilities in the State are able to operate without incurring greater costs...." Kilstein Declaration at ¶ 15.

86. The Lewin/ICF Report contains two separate analyses comparing costs to rates. Both analyses are based upon the State's "desk .reviewed" cost data obtained from facility cost reports as reflected in the State's CSNURSE data file. Tr. at 1.106; *see generally* Lewin ICF Report at Appendix A. These are costs of the type which the State deems to be related to patient care and which the State uses in setting the rates for facilities. Tr. at 1.106. Periodically, the State conducts more intensive "field audits" of selected facilities in which all records are reviewed on a more detailed basis. Tr. at 1.108; *see also* ¶ 16 *supra.* "Allowatic costs" are those reported base period costs which are acted upon by the computerized reasonableness screens. For example, a facility may report a $1 million salary for an individual nurse for a given year. While such a reported cost could survive desk review, it would not survive the application of the reasonableness screen; allowable costs are therefore categories of costs which the system allows. However, for rate-setting purposes, New Jersey uses the desk reviewed data. *Id.*[12]

87. Dr. Manard's first analysis is a "retrospective" review of the most recent period for which complete data were available, *i.e.*, calendar year 1989. Lewin/ICF Report at 5–10. Dr. Manard compared the allowable costs incurred by and rates paid to 238 facilities and concluded that 91% of facilities (217)

---

12. Dr. Manard concluded that, while the CSNURSE cost data is not field audited, field auditing would not have a significant impact on the data. Tr. at 5.85. For approximately 70% of facilities field audit recoveries were less than .45% of costs, and 90% of facilities were subject to recoveries of less than 1% of costs. Tr. at 5.85; Pl.Ex. 45. Moreover, these recoveries pertain to facilities selected for audit at least in part on a non-random, targeted basis. Tr. at 4.100–4.101, 5.84.

spent more money caring for Medicaid patients than they were paid. *Id.* at 8. Among those facilities that lost money on Medicaid, losses totalled $88 million, for an average of $13.43 per patient per day (or $405,530 per facility per year). *Id.* Only 20% of facilities had at least 95% of allowable costs reimbursed while nearly one-third has less than 80% of their allowable costs reimbursed. *Id.* at 9.

88. The report also contains a "prospective" analysis which examines the costs incurred and rates paid for the rate setting cycle of July 1, 1990—June 30, 1991, *i.e.,* FY 1991. *See* Lewin/ICF Report at 11–26. The rates for FY 1991, which were revised October 1, 1990, were set by DHS using 1989 cost report data adjusted for inflation. *Id.* at 11. Lewin/ICF used three alternative inflation assumptions to adjust the 1989 cost data for comparison to the FY 1991 rates.

89. First, using the DHS inflation factor, which Dr. Manard asserts understates the actual inflation faced by nursing facilities, *id.* at 27–31, the report found that 79.5% of facilities (186) would spend more caring for Medicaid patients than they actually would be paid by DHS in FY 1991. *Id.* at 14.

90. Second, using the Data Resources, Inc. ("DRI") inflation factor which projects price increases in the goods and services purchased by nursing facilities, Dr. Manard found that 89% of facilities (208) would spend more caring for Medicaid patients than they would be paid in FY 1991. *Id.* at 19.[13] Total Medicaid losses were estimated to be approximately $74.4 million for an average of $11.61 per patient per day (or $357,692 per facility per year), while only 29.5% of facilities would have at least 95% of allowable costs reimbursed. *Id.* at 20.

91. Third, using an inflation factor based upon actual historical rates of cost increase in New Jersey nursing facilities, Dr. Manard found that 96% of facilities (225) would spend more caring for Medicaid patients than they would be paid in FY 1991. *Id.* at 24. Total Medicaid losses were estimated to be $139.8

million (or $621,333 per facility per year), *id.,* and 41% of facilities were projected to have less than 80% of their allowable costs reimbursed. *Id.* at 25.

92. Based on these analyses, Dr. Manard testified that the New Jersey Medicaid program pays no more than 10–15% of facilities their total allowable costs of providing services to Medicaid patients. Tr. at 1.91–1.92.

93. Additionally, Dr. Manard presented a quartile analysis which shows that under the retrospective analysis described above, of those facilities falling within the lowest cost quartile, only 28.8% recovered their total allowable costs. Pl.Ex. 36 (Quartile Analysis A); Tr. at 1.95. In the second lowest quartile, only 6.8% of facilities recovered their total allowable costs. Pl.Ex. 36. In the two highest cost quartiles, 1.7% had rates adequate to cover their total allowable costs. *Id.; see also* Pl.Ex. 36 (Quartile Analysis B) (prospective analysis using DRI inflation factor).[14]

94. Dr. Manard testified that the Medicaid losses incurred by facilities in this case are not modest or *de minimis* and equate to substantial amounts of money for large numbers of facilities. Tr. at 3.122. Her analyses show that very small percentages of facilities recover 95% or more of their actual allowable costs, *i.e.,* ranging from 20% to 29.5% under her retrospective analysis and prospective analysis (using DRI). *See* Lewin/ICF Report at 9, 20. As shown in her quartile analyses, a very small proportion of the lower cost facilities (*i.e.,* the lower two quartiles) are receiving rates that cover their allowable costs, *i.e.,* ranging from 17.8% to 19.8%. Pl. Ex. 36 (Quartile Analyses A and B).

95. In response, defendants initially reassert that plaintiffs have neglected to address the analytical approach used by the Third Circuit in *West Virginia University Hospitals;* defendants argue that "because what matters is aggregate reimbursement, neither of the two approaches discussed by plaintiffs is necessary." Defendants' Response to

---

13. When Dr. Manard adjusted this calculation to account for "bed-hold" days, the percentage of "losers" decreased slightly to 88.4%. Pl.Ex. 36 (Quartile Analysis B); Tr. at 1.94–1.95.

14. These analyses included the technical adjustment for "bed-hold" days, discussed *infra.*

Plaintiffs' Proposed Findings of Fact at ¶ 34. Defendants assert further that, "[i]n any event, the approach adopted by plaintiffs is contrary to the plain language of the Boren Amendment, which requires the reimbursement of only those costs which must be incurred by economic and efficient providers to provide requisite care." *Id.* In this regard, defendants point to several aspects of Dr. Manard's analysis which purportedly overstate the costs which must be reimbursed and which underestimate the amount of coverage provided.

96. As discussed *supra*, defendants' expert identified and removed from plaintiffs' estimated cost figures broad categories of costs that defendants allege are either unallowable under federal law .or are not costs that must be incurred by an efficiently and economically operated nursing facility. Tr. at 3.134; Defs.Exh. 36. After these adjustments were made, the gap between aggregate costs and aggregate rates purportedly narrowed from 86.3% to 97.4%, while the percentage of facilities recovering high percentages of their "actual allowable costs" was augmented substantially. Defs.Exh. 36.

97. Plaintiffs dispute many of Dr. Engquist's adjustments. However, as will be discussed *infra*, the Court need not determine at this preliminary stage of the litigation precisely which costs must be excluded from a cost-rate analysis in order to measure compliance with the Boren Amendment. Plaintiffs' criticisms do not undermine defendants' principal point that Dr. Manard made no effort to eliminate from her cost-rate analysis large categories of costs that need not be reimbursed under the Boren Amendment. As it is plaintiffs' burden to demonstrate noncompliance, particularly in the context of a request for preliminary relief, this demonstrates that plaintiffs' cost-rate analysis is insufficient to support plaintiffs' assertions of a likelihood of success on the merits.

98. Specifically, defendants made seven adjustments to the cost and rate data used in plaintiffs' analysis. Dr. Manard agreed with two of these adjustments, and introduced a new exhibit at the hearing which incorporated these adjustments. Tr. at 1.93–1.94, 1.100; Plts.Exh. 38, p. 1. These adjustments increased the number of facilities receiving 100% of their allowable costs by 70% over the figure originally reported by Dr. Manard.

99. The first adjustment adopted by Dr. Manard was to recognize payments made to facilities for bed-hold days; that is, days when a facility resident may be temporarily absent from the facility. Tr. at 1.93. The State continues to pay the full reimbursement rate for bed-hold days but these payments are not recorded with regular rate payments and therefore were inadvertently omitted from plaintiffs' analysis. Defendants assert that inclusion of bed-hold payments increased aggregate reimbursement to facilities by about $6.4 million in 1989 over Dr. Manard's original calculations. Defs.Exh. 36.

100. The second undisputed adjustment adopted by Dr. Manard was to adjust nondirect patient costs to reflect facilities operating at less than 90% overall occupancy. Tr. at 1.100; Plts.Exh. 38. This adjustment was based upon the principle that facilities operating at low occupancy levels incur higher per patient costs because they are distributing various fixed expenses over a smaller patient population. Engquist Written Testimony at ¶ 12; Tr. at 1.99. The State has concluded, and plaintiffs do not contest, that facilities operating at less than 90% occupancy are operating at inefficient levels and that the proportionately higher costs associated with occupancy rates below that level need not be reimbursed.[15] *See* Kohler Decl. at ¶ 31; Tr. at 1.100. This adjustment reduces the costs in Dr. Manard's cost/rate analysis by approximately $7.4 million.[16]

101. The five remaining adjustments proposed by defendants concerned removal from

---

**15.** Dr. Manard's agreement with Dr. Engquist's assertion that occupancy rates of less than 90% are inefficient contrasts with the *Tioga Pines* court's finding that Dr. Engquist's exclusion of facilities with less than 80% occupancy rates was "completely arbitrary." *Tioga Pines,* Slip Op. at ¶ 52.

**16.** With the adjustments adopted by Dr. Manard for bed-hold days and low-occupancy facilities, the gap between costs and rates for 1989 narrows to 88%. *See* Defs.Exh. 36.

the cost side of the cost-rate analysis amounts associated with (a) estimated audit adjustments; (b) excess nursing hours; (c) excess administrative costs; (d) capital costs increases due solely to ownership changes; and (e) depreciation.

102. Defendants' expert initially reduced aggregate reported costs by 1.91% across the board as a proxy for the adjustment that would have been made to plaintiffs' costs had all facilities been subject to a full field audit. Engquist Written Testimony at ¶ 15(b). The 1.91% figure purportedly was based upon the average audit adjustment made for facilities that were audited in 1985 and 1986, the two most recent years for which full cost audits have been completed for a substantial number of facilities. *Id.;* Tr. at 0.144. While the evidence in the record indicates that this adjustment is a conservative estimate of the extent to which aggregate reported costs of the industry are likely to contain costs that would be eliminated through full field audits of all facilities, the Court has reservations regarding the accuracy of the 1.91% figure on the evidence currently before it.

103. In this regard, the Court notes that plaintiffs' expert disagreed with the premise that some average adjustment properly could be made to remove costs that would ordinarily be disallowed through a full field audit. Tr. at 1.114. Plaintiffs also challenged the reliability of defendants' figure because there appeared to exist a wide range between the actual disallowed amounts among individual audited facilities, Tr. at 1.112, and also because the selection of facilities for audit was not conducted on an entirely random basis. Tr. at 5.84–5.85.

104. Plaintiffs do not, and indeed cannot, dispute the State's authority to reduce costs to reflect those disallowed through field audit; moreover, the Court finds that the logic underlying defendants' attempt to quantify such an adjustment is not unreasonable. The adjustment proposed by defendants decreased 1989 reported costs by $11.6 million. However, in light of the complexity of making these calculations, the Court finds that it cannot determine the precise figure by which to reduce plaintiffs' estimate on the current record. Accordingly, the Court concludes that while the exact percentage of the adjustment may not be assessed at this time, some downward adjustment is appropriate, further bolstering defendants' claim that New Jersey's rates are adequate and undermining plaintiffs' likelihood of success on the merits.

105. The deposition testimony of the plaintiff facilities also reveals that New Jersey facilities incur nursing costs above the State's reasonableness limit in part because they choose to staff in excess of the State's minimum licensure standards for a variety of reasons, not all of which are related to complying with state and federal standards. For example, some facilities try to achieve a superior standard of care because it is consistent with the mission of the charitable, religious, or fraternal organization with which they are affiliated. Dorsky–Flynn Dep. at 160; Goldstein Aff. at ¶ 20. Others may do so because they are trying to attract more private pay residents, Goldstein Dep. at 46–48, and private payers may select a nursing facility on the basis of the amount of nursing care provided. Tr. at 3.84. These are permissible, even laudable, goals, but they are not required by the Boren Amendment. Other facilities may have excessive staff due to unfortunate business decisions. Kohler Decl. at ¶¶ 35–36. Indeed, Dr. Manard agreed that some of the facilities in her sample provide uneconomical amounts of nursing. Tr. at 3.51. The Court finds, for purposes of deciding the instant motion for preliminary injunctive relief, that at least some portion—perhaps a significant portion—of nursing hours reported over the nursing screen are likely to be excessive for purposes of Boren Amendment reimbursement.

106. Accordingly, without deciding the precise point at which nursing hours become "excessive" for purposes of reimbursement under the Boren Amendment, the Court concludes that some downward adjustment from plaintiffs' calculations is required, further detracting from the impact of plaintiffs' statistical analysis and diminishing their likelihood of success on the merits.

107. Defendants also removed all reported administrator and other management costs in excess of the State's reasonableness

screen. The screen is derived from actual reported expenditures by facilities adjusted to eliminate related party payments and to account for varying facility size. N.J.A.C. § 10:63–3.5(b). Plaintiffs did not challenge the reasonableness of this screen. Defendants' expert testified that management costs are frequently the target of cost-containment efforts. Tr. at 3.148, 4.45; Engquist Written Testimony at ¶ 23. While there may be valid reasons why some facilities incur excess administrative costs, this speaks more to the appropriate size of the adjustment. The Court agrees with defendants that an appropriate cost-rate comparison for purposes of determining compliance with the Boren Amendment would have attempted to remove at least those excess costs, such as administrative expenses, that are only indirectly related to patient care. As with the foregoing reductions, the Court determines that this adjustment, while undetermined as to its amount, would undoubtedly serve to reduce the alleged shortfall and consequently diminish plaintiffs' likelihood of success on the merits.

108. Defendants' final two adjustments involved the elimination of capital cost increases resulting from changes or transfers of ownership which occurred after the effective date of the Deficit Reduction Act of 1984 ("DEFRA") and the removal of reported depreciation costs. DEFRA prohibited states from recognizing in their reimbursement rates any increases in capital costs that were caused by an increased valuation of assets resulting solely from a sale or other change of ownership. Pub.L. No. 98–369, § 2314, 98 Stat. 494, 1079 (1984). Although the law was later amended to permit states to recognize a portion of such increased valuations up to certain limits, Pub.L. No. 99–272, § 9509(a), 100 Stat. 82, 211 (1986), the Medicaid Act still does not require states to recognize such costs. 42 U.S.C. § 1396a(a)(13)(C). *See Folden,* 744 F.Supp. at 1526–27.

109. Defendants estimated the amount attributable to these non-allowable capital costs by calculating the ratio of property costs to other operating costs within two groups: (a) facilities that have changed ownership after September 1984, and (b) those

that had not. Engquist Written Testimony at ¶ 15(e). Defendants then capped the capital costs reported by the transferred facilities at the percentage of property costs reported by non-transferred facilities. *Id.* Plaintiffs did not present any evidence that this method for estimating the amount of reported costs attributable to unallowable capital costs under DEFRA was inaccurate.

110. With regard to the removal of reported depreciation, defendants argue that, for purposes of evaluating whether a state reimburses costs that must be incurred, such adjustments are appropriate because depreciation for most facilities is not an incurred expenditure. Depreciation ordinarily is not a cash outlay nor is it even a deferred loss to the facility where the overall value of the facility is appreciating. *Folden,* 744 F.Supp. at 1516. The only evidence in the record concerning the value of facilities indicates that nursing facilities in New Jersey generally have appreciated considerably in value. *See* Engquist Decl. at ¶ 22; Defs.Exh. 25. In addition, it appears that New Jersey facilities may double-report depreciation expenses because they are also allowed to report maintenance and replacement costs which overlap with depreciation. N.J.A.C. §§ 10:63–3.9(a), 3.13. Kilstein Decl. at ¶ 36.

111. The Court expresses no opinion as to the propriety of these reductions, which do not appear to involve significant sums in relation to the foregoing adjustments to plaintiffs' calculations.

112. After the adjustments described above are made, the coverage gap alleged by plaintiffs was reduced substantially. In Dr. Manard's initial analysis (before making adjustments for bed-hold payments and low occupancy facilities), payment rates reimbursed 86.3% of the costs. Defs.Exh. 36. After making the adjustments described above, the rates reimburse well over 90% of the costs; when all of defendants' proposed reductions are made, the rates reimburse 97.4% of the costs. *Id.*

113. An additional adjustment has been proposed by defendants. Dr. Engquist pointed out that Dr. Manard's cost-rate analysis includes the costs of new facilities and statistical outliers. *See* Engquist Written

Testimony at ¶ 16. New facilities generally are not efficiently and economically operated because they have low occupancy and incur start-up costs that are not efficient and economic. *See* Engquist Written Testimony at ¶ 16. Dr. Engquist defined "outliers" as facilities with costs that are two standard deviations from the mean in either direction. Engquist Written Testimony at ¶ 16. She stated without contradiction that this definition of outliers is commonly used in rate-setting systems. *Id.*

114. Dr. Engquist prepared a chart demonstrating the effect of removing both the costs and rates of outliers and new facilities. Defs.Exh. 58. New facilities were defined as those that filed their first cost report in 1989 (the year on which Dr. Manard's cost/rate analysis is based). While these results could not be cumulated with each other or with the other adjustments shown on Defendants' Exhibit 36, the effect of removing outliers and new facilities is significant. By removing outliers, the percentage of aggregate costs reimbursed rises from 86.3% to 87.8%: by removing new facilities, the percentage of aggregate costs reimbursed also rises. Presumably, the cumulative effect of removing both categories of costs would be to raise the percentage of aggregate costs reimbursed by an even greater margin.

115. For the reasons set forth above, the Court cannot conclude that the statistics presented by either Dr. Manard or Dr. Engquist demonstrate that plaintiffs have the requisite degree of likelihood of succeeding on the merits of their substantive claim under the Boren Amendment. Moreover, plaintiffs' cost-rate analysis appears flawed. Plaintiffs' expert made no attempt to estimate or eliminate patently unreimbursable costs, such as those prohibited by DEFRA or those likely to be disallowed as a result of full field audits. Plaintiffs also made no attempt to prove that facilities operated under strict cost controls, which would have been necessary to justify Dr. Manard's failure to identify and exclude from the database costs that are not necessarily incurred by efficiently and economically operated facilities. Evidence presented by defendants demonstrates that major categories of unnec-essary costs were not eliminated from plaintiffs' analysis. *See* ¶¶ 94–110. Because of plaintiffs' heavy reliance on their cost-rate analysis to demonstrate that New Jersey's rates are not reasonable or adequate, the flaws in that analysis compel the conclusion that plaintiffs have not carried their burden of demonstrating a likelihood of success on the merits of their substantive challenge.

**E.** *Reasonableness of Individual Components of the New Jersey Plan*

116. As indicated above, plaintiffs' cost-rate analysis assumes that actual expenditures, in a category recognized by the State (*e.g.* nursing costs), form the basis for a comparison with actual rates paid, and defendants' attack on the cost-rate analysis accepts this assumption, at least as to wages paid to nurses and nurse staffing. However, the New Jersey system screens out certain nursing wages and certain nurse-staffing patterns. *See* ¶¶ 13–38. The Court will now address those screens.

**i.** *Nurse Staffing Analysis*

117. Plaintiffs' most serious charges are leveled at New Jersey's methodology for reimbursing nursing costs; such costs comprise approximately 40% of facilities' reported costs. Tr. at 2.4. Dr. Manard found that the amounts paid for the nursing component of the Medicaid rate are inadequate to meet standards which are necessary to assure quality care, Lewin/ICF Report at 56–80, in part because facilities consistently staff at levels in excess of the DOH minimum licensure standards even though such staffing results in Medicaid losses. *Id.* at 70–74; Pl.Ex. 40 (Table 22). Furthermore, she concluded that the actual staffing level and mix of licensed personnel in nursing facilities in New Jersey are consistent with national norms. *Id.* at 70; Tr. at 2.6–2.7.

118. A survey of directors of nursing in New Jersey conducted by Dr. Manard found that the minimum hours for licensure established by DOH are not adequate to afford appropriate patient care. Lewin/ICF Report at 74–79. Eighty percent of the directors of nursing responding to the survey said that the minimum RN hours were, in their professional judgment, inadequate to meet the

needs of patients in their facilities. *Id.* at 77. Fifty percent said that the minimum LPN and aide hours were inadequate. *Id.* National data show that nursing homes staff at about 30% professional time, a proportion that is increasing. Lewin/ICF Report at 75. Dr. Manard testified that the research literature over the past 20 years indicates a relatively consistent relationship between quality and professional, particularly RN, nursing time. Tr. at 2.8–2.9. The DOH Advisory Standards urge facilities to staff at 30% professional time, N.J.A.C. § 8:39–26.3, whereas the nursing screen for Medicaid payment uses a limit of 20% on licensed nursing time. N.J.A.C. § 8:39–25.2(f).

119. Proceeding under the assumption that New Jersey facilities are staffed in accordance with the DOH Advisory Standards, Dr. Manard found that it was not even theoretically possible to provide necessary nurse staffing without losing money under the DHS payment limits for nursing services. Lewin/ICF Report at 80–94. This analysis was performed as one test of whether the State's 15% "override" on maximum wages is sufficient to account for variations in staffing patterns as well as the required director of nursing. *Id.* at 80–81.[17] Dr. Manard concluded that the 15% override is inadequate because, after all of the limits on nursing costs are applied, only 20–35% of facilities actually incur nursing costs within the limits. *See* Tr. at 2.38–2.42.

120. She further concluded that the actual staffing patterns in New Jersey facilities are appropriate, consistent with quality of care, and not the result of inefficient operations, *see* Lewin ICF Report at 70–80, and that the limits on nursing costs, in covering the costs of only 20–35% of facilities, also fail to meet the State's own standard of reimbursing the costs of at least 50% of facilities in a cost center.

121. Plaintiffs argue that facilities routinely provide care in excess of the levels for which payment is available only because such care is consistent with the needs of patients and the objectives of attaining and maintaining the highest practicable well-being of each resident, as mandated by federal law under 42 U.S.C. § 1396a(a)(13)(A).

122. Plaintiffs further argue that, since the majority of facilities in New Jersey already are providing care in excess of the Advisory Standards,[18] basing the limits on the Advisory Standards would bring defendants closer to recognizing the actual patterns of care in New Jersey.

123. Plaintiffs also decry the absence of any empirical evidence that the maximum reimbursed hours, based on minimum DOH licensure standards, reflect the actual care needs of Medicaid patients, and suggest that in the absence of any convincing evidence to the contrary, actual nursing hours provided are the best evidence of the care needs of patients.

124. Finally, plaintiffs argue that the nursing limits fail to take account of the actual expenditures of facilities in employing the mandatory director of nursing.

125. Plaintiffs' primary criticism of the nurse staffing screen is its reliance on the minimum hourly standards required by the New Jersey Department of Health for licensure purposes. Plaintiffs' expert asserted that the theory underlying New Jersey's nursing component is that licensing minimums equal payment maximums. Tr. at 2.4. In her view, this approach is unreasonable on its face. However, as explained below, it is not entirely accurate to assert that licensing minimums equal reimbursement maximums.

126. Plaintiffs make three arguments in support of their contention that New Jersey's use of the licensure standard for reimbursement purposes causes rates to fall below Boren Amendment standards. First, plaintiffs allege that the "highest practicable" language added to the Boren Amendment by OBRA '90 requires New Jer-

---

17. As described in detail *supra*, DHS establishes the wage limit at the median of statewide wages plus 15%. N.J.A.C. § 10:63–3.8(b)6.

18. *Compare* Pl.Ex. 40 (Table 22) (3.0 average nursing hours per day) and N.J.A.C. § 8:39–26.1 *et seq.* (recommending minimum hours of 2.75). National average nursing hours per patient per day range from 2.90 to 3.23. Lewin/ICF Report at 72.

sey's Medicaid agency to adopt the DOH advisory standards that call for an average of 2.75 hours of nursing care per patient plus acuity hours. Second, plaintiffs argue that facilities cannot provide quality care with the amount of nursing hours currently reimbursed by the State. Third, plaintiffs allege that the current hourly standard does not sufficiently reflect varying case mix among facilities. Each of these allegations is examined in turn below.

### a. *DOH Advisory Standards*

127. DOH's advisory standard of 2.75 hours per patient day is merely aspirational and is not required by State law. *See* Kilstein Decl. at ¶ 24. As noted above, the Boren Amendment, as amended by OBRA '87 and OBRA '90, requires only a level of reimbursement that is reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities in order to provide the care and services required by law. While the nursing home reforms enacted by OBRA '87 appear to have added to these legal requirements, the "highest practicable" language does not impose any obligations beyond compliance with the requirements of OBRA '87 and other applicable state and federal requirements. When Congress included the "highest practicable" language as part of a series of miscellaneous technical amendments, *See* Pub.L. No. 101–508, § 4801(e), 104 Stat. 1088–215 (1990), Congress anticipated that the 1990 amendments relating to the Medicaid program would "reduce Medicaid program outlays." H.Rep. No. 101–881, 101st Cong.2d Sess. 67 (1990), *reprinted in* 1990 U.S.Code Cong. & Ad.News 2079.

128. This history counsels strongly against interpreting the new language as a drastic revision of the Boren Amendment or as an imposition of new payment obligations on the states. There is no indication in the legislative history that Congress intended the 1990 technical amendment, for which no additional funding was provided, to alter the Boren Amendment standard, which requires reimbursement only of those costs that must be incurred by efficiently and economically operated facilities in order to provide care and

services in conformity with state and federal standards. In the absence of a clear indication that Congress intended to require a drastic departure from a cost-conscious efficiency and economy standard of the original version of the Boren Amendment, the Court interprets the "highest practicable" language to be the equivalent of, or a restatement of, the level of care and services required by applicable state and federal standards, including those mandated by OBRA '87. So long as a state provides sufficient reimbursement to meet the costs that must be incurred by efficient and economic providers in order to comply with applicable state and federal standards of care, including the new obligations imposed by OBRA '87, that state complies with the Boren Amendment, as amended by OBRA '90.

129. The Court notes an inherent ambiguity surrounding the term "highest practicable;" the Court determines that, for purposes of this litigation, a "practicable" level of care is one that represents a balanced achievement of statutory objectives. Where, as here, cost-consciousness is such a prominent statutory objective, the Court cannot conclude that OBRA '90 intended to mandate a higher level of care at necessarily increased cost. Thus, the Court rejects plaintiffs' attempt to equate the Advisory Standard with the "highest practicable" language, in the absence of any showing that 2.75 hours is required to comply with the applicable legal requirements for care. As discussed further below, plaintiffs have failed to make that showing.

### b. *Quality of Care*

130. Plaintiffs offered two forms of evidence in support of their allegation that the State's hourly requirement is inadequate to provide the care and services required by law: (1) comparisons of average hours reimbursed by the State to hours actually provided by New Jersey facilities and by facilities nation-wide, and (2) the results of a survey of facilities' Directors of Nursing ("DONs") conducted by plaintiffs' expert in preparation for this litigation. The Court concludes that neither demonstrates that New Jersey facilities

cannot provide the legally requisite level of care at the present hourly standard.

131. Plaintiffs' expert calculated that, after acuity hours were counted, the State currently reimburses facilities on average for 2.63 hours of nursing care per patient per day. Plts. Exh. 40. She also calculated that facilities expend, on average, three hours of nursing care per patient day. *Id.* The State has not disputed these figures.

132. The data on the average number of nursing hours reimbursed and the average number of nursing hours incurred, when combined with the 115% enhancement factor in the State's formula, appear favorable to the State's position. When the average actual reimbursed hours per patient day—2.63— is multiplied by 115%, the result yields an hourly standard of 3.02. Tr. at 3.78. This standard is greater than the average hours reported by facilities (3.0) and substantially greater than the 2.75 hours standard that plaintiffs endorse. Consequently, the enhancement factor allows facilities that pay wages at or below the median to be reimbursed for nurse staffing levels in excess of either the licensure standard (2.5) or the advisory standard (2.75) endorsed by plaintiffs. This demonstrates that the effect of the 115% enhancement factor is that licensure minimums do not equal reimbursement maximums under New Jersey's methodology. To the contrary, for those facilities that hold wages at the level of the median, New Jersey reimburses nursing hours slightly above the licensure standard.

133. Standing alone, the fact that New Jersey reimburses for fewer hours than the state-wide average of hours actually incurred does not demonstrate that New Jersey's standard is insufficient to provide quality care. Moreover, plaintiffs have offered no direct proof that three hours of nursing time are necessary for efficiently and economically operated facilities to provide legally requisite care. Dr. Manard asserted in her direct testimony that nursing homes have no incentives to staff above levels necessary to meet the legal requirements and apparently asks the Court to infer that incurred hours are required hours. Tr. at 2.6. On cross-examination, however, she acknowledged facts demonstrating that this is not accurate. In this regard, defendants first point to the fact that approximately one-third of the nursing facilities in New Jersey are run by fraternal or religious organizations whose participation in the nursing home industry is motivated by humanitarian or religious principles. Tr. at 3.84. Such organizations have a non-monetary incentive to provide levels of care beyond what is legally required. Furthermore, the for-profit facilities compete for patients who are not eligible for Medicaid and pay their own way. In order to attract these private payors, some facilities will provide levels of nursing service beyond what is legally required. Tr. at 3.84. Thus, there exist incentives for nursing facilities to staff above the legal requirements.

134. The record currently before the Court indicates that at least some New Jersey nursing facilities employ more nurse staffing than is legally required. The affidavits of representatives of two of the named plaintiffs averred that these facilities—one for profit and one non-profit—could not provide the level of care they thought was appropriate, not that they could not provide legally required care. *See* Goldstein Aff. at ¶ 20; Kantrowitz Aff. at ¶ 11.

135. Dr. Manard also relied on national data indicating that in 1989, the most recent year for which figures are available, the average federally-certified (Medicare or Medicaid) facility provided 2.9 nursing hours per patient day. Manard Report at 70–72. This statistic is countered by data demonstrating that nursing facility residents in New Jersey appear to have fewer functional and medical needs than nursing facility residents nationally. Data collected by HCFA on functional and medical needs among nursing home residents indicate that New Jersey facilities showed fewer residents with needs in 9 of 13 areas, the same proportion in one area, and more patients with needs in only three areas. Engquist Decl. at ¶ 29. Because the limited information before the Court indicates that New Jersey facilities have a relatively healthier resident population than the national norm, they should be expected to incur fewer rather than more nursing hours than the national average.

136. Plaintiffs also presented the results of a survey of DONs, conducted by plaintiffs' expert in preparation for this lawsuit, to show that the State's levels are insufficient to ensure legally requisite care. Eighty percent of the DONs who responded to plaintiffs' survey indicated that the minimum RN hours for the facility were not adequate to meet patient needs. Manard Report at 78. On the issue of whether the minimum hours for LPNs and aides were adequate or inadequate, respondents were more evenly divided. Fifty-two percent said LPN hours were inadequate; 47% thought they were adequate. *Id.* Fifty-three percent thought aide hours were inadequate; 46% thought they were adequate. *Id.* Thus, the professional opinion of New Jersey's DONs was almost evenly divided, except as to RN's.

137. In any event, the Court does not find the DON survey to constitute reliable evidence that the current staffing levels are inadequate. First, the survey was conducted only among facilities that were members of the plaintiff associations in this litigation, and the facilities were advised in the cover letter used to distribute the survey that the results were to be used for purposes of this suit. Since the facilities for whom each of these directors of nursing worked stand to gain financially from a favorable decision in this suit, the answers were not likely to have been entirely objective or candid. Second, the question concerning adequacy of the minimum standard was asked only of those who reported nursing hours above the standard. Thus, the selection of respondents may have skewed the results in plaintiffs' favor. Third, the question put to the DON's called for a highly subjective response: "In your professional judgment, are the minimum [RN, LPN, and aide] hours for this facility adequate to meet the care needs of the residents of this facility?" Attachment D–1 to Manard Report at 7. Fourth, and perhaps most important, the question did not ask whether the minimum hours were adequate to meet legal requirements; it was instead directed at a more amorphous concept of "care needs." *Id.* Dr. Manard acknowledged that her respondents were free to define care needs as they saw fit rather than with reference to any legal standard. Tr. at 3.92–3.93. For all of the foregoing reasons, the Court can give no substantial weight to the results of the survey on this point.

138. The State's expert conducted a study to determine whether there existed any relationship between factors such as level of reimbursement, level of nurse staffing, and level of reported expenditures and quality of care. Engquist Decl. at ¶¶ 24–26. Quality of care was measured with reference to certain indicators reported by the federal Health Care Financing Administration concerning nursing facilities' compliance with federal standards and conditions of participation in federal programs. *Id.* These data are drawn from periodic surveys of nursing homes which are required by federal law. 42 U.S.C. § 1395, as amended. If a facility does not comply with such a standard or condition, it is cited for a deficiency. Engquist Decl. at ¶ 25. This analysis demonstrated no correlation between reimbursement, nurse staffing levels, or facility expenditures and quality of care. *Id.* at ¶ 26. The Court is aware that there is an element of subjectivity in the way deficiencies are assessed during the survey process, and that there may be other measures of quality of care. Nonetheless, these deficiency records appear to be the best available measures for comparing facilities' ability to comply with federal and state standards, Engquist Dep. at 42, and it is therefore significant that the number of deficiencies for which facilities in New Jersey were cited does not appear to be directly related to nurse staffing levels.

139. It is also significant that the hourly standard challenged by plaintiffs is the standard by which an independent department, the Department of Health, determines whether a facility may be licensed to provide nursing care in New Jersey. Plaintiffs complain that if they staff only at this level, they will provide inadequate care. The logical extension of this claim is that the State, through its Department of Health, has established nursing standards that allow a facility to operate at staffing levels that would not ensure safe and adequate care. Yet the plaintiffs and their expert have not alleged that the licensure standards are inadequate to protect the safety and welfare of New

Jersey nursing facility residents, nor do they contend that the State's licensure standards fall below federal standards. Tr. at 3.49. Indeed, plaintiffs have not sought to bring the Department of Health into this suit.

·140. DOH is the State department charged with setting State standards and enforcing State and federal standards of care in nursing facilities. Kilstein Decl. at ¶ 19. A presumption of validity attaches to the DOH's choice of minimum nurse staffing hours. Absent concrete evidence to the contrary, which plaintiffs have not presented, this Court has no basis for disputing DOH's apparent judgment that the current licensure standards are sufficient to ensure adequate care.

### c. *Case Mix*

141. Plaintiffs' third contention is that the State's reimbursement formula does not account for the fact that an efficient and economically operated facility may be forced to staff at levels above the minimum licensure standards in order to respond to varying levels of functional and medical needs among residents. In particular, plaintiffs' expert described how the CARE system allegedly fails to address residents' functional needs, as measured by limitations on so-called Activities in Daily Living ("ADLs"), and the corresponding increase in nursing time required to meet those needs. Manard Report at 61–65; Tr. at 1.79–1.87; Plts.Exh. 35. Systems that calculate reimbursement on the basis of medical acuities and ADLs are generally referred to as "case mix" systems. *See* Manard Report at 61.

142. Plaintiffs' expert acknowledges that the Boren Amendment does not require states to adopt case mix systems. Tr. at 2.92. Although the Boren Amendment was enacted in 1980, as recently as five years ago only one state had adopted such a reimbursement system. Engquist Dep. at 391. No more than 15 states have such case mix systems at the time of this litigation. Tr. at 2.94–2.95. Plaintiffs' expert presented evidence that New Jersey's reimbursement system applies a relatively·rudimentary case mix measure through its semi-annual evaluation of patient acuities. Nonetheless, the Court concludes that the State cannot be

held liable for applying imperfectly that which it is not required to apply at all.

143. Nor does it appear that the State's reimbursement system is arbitrarily unresponsive to varying patient needs. The hourly nurse staffing standard adopted in 1990 varies according to the presence of certain acuities among an individual facility's residents. To the extent there may be other acute medical conditions or ADLs not recognized by the current formula, the 115% enhancement factor allows facilities operating at efficient and economical wage levels to staff at levels well above the minimum hours. The enhancement factor allows facilities with wages at the median level—*i.e.,* half of the industry—to be reimbursed for up to 3.02 nursing hours. This flexibility appears to adequately account for varying case-mix.

144. The result of the use of the State's nurse staffing screen is that approximately 35% of facilities recover their total nursing expenditures under the current system. Kohler Decl. at ¶ 17; Defs.Exh. 11. Fifty-one percent recover 95% or more of their costs. Tr. at 5.49; Defs.Exh. 11. The primary reason why a greater number do not recover their costs appears, at this preliminary stage of the litigation, to be that facilities in New Jersey staff at levels considerably in excess of the State's minimum hours, Kohler Decl. at ¶ 13, whether for competitive and/or humanitarian reasons or for lack of efficiency and economy. The State's expert acknowledged that, in her work as a consultant to states on the design of reimbursement systems, she has recommended systems that are more generous in the area of nursing costs than New Jersey's. Tr. at 4.52. However, the Court feels that the absence of what may be desirable to Dr. Engquist is not necessarily a violation of the Boren Amendment.

145. At this point, there is insufficient evidence to permit the conclusion that the State's use of its hourly standard is impermissible under the Boren Amendment. The plain language of the Boren Amendment requires only that level of reimbursement sufficient to ensure that facilities can comply with state and federal health and safety stan-

dards. Plaintiffs have not satisfied their burden of demonstrating that facilities in New Jersey cannot comply with such requirements under the current reimbursement system.

### ii. *Contract Nursing Costs*

146. In 1989, contract labor accounted for 5.05% of the total nursing hours provided by facilities. Lewin/ICF Report at 34. Dr. Manard found that the cost of contracted nursing labor significantly exceeds the cost of staff nurses; in 1989, the median hourly wage of an RN was $21.27 (including benefits), while the same RN on a contract basis cost a facility $30.27, approximately 42% more. *Id.* The disparity for LPNs was even greater, *i.e.*, 61%. *Id.* Dr. Manard opined that while a nursing facility has little or no incentive to use contract labor, nursing shortages may leave such a facility with no other choice but to obtain necessary staff on this basis. *See* Lewin/ICF Report at 34; Tr. at 2.5–2.6. However, on cross-examination she acknowledged that she did not know the reasons why specific facilities had used contract nursing labor or whether the facilities had any realistic alternatives. *See, e.g.,* Tr. at 4.147–4.148, 4.164. Nevertheless, she concluded that it is unreasonable for the State to exclude contract nursing costs from its calculation of the wage limits used in setting the nursing cost screens. Tr. at 3.74.

147. Although New Jersey reimburses contract nursing costs up to a limit in the same manner as the costs of salaried nursing staff, the State does not include the costs of contract nursing in determining the nursing screen. Kilstein Decl. at ¶ 42; Tr. at 3.69. This policy is not unique to nursing costs but is applied to all non-administrative wages. Kilstein Decl. at ¶ 42.

148. Plaintiffs allege that in failing to include the costs of contract nurses in calculating the screen, the State fails to take into account economic trends and conditions in violation of federal law. The economic trend or condition to which plaintiffs refer is an alleged nurse staffing shortage.

149. According to the Director of the State's Medicaid agency, the State does not use contract nursing costs to calculate the wage portion of the nursing screen because (a) the costs of contract nurses are uneconomical, (b) the care provided by contract nurses is not as good as that provided by salaried nursing staff, and (c) the widespread use of contract nursing lends itself to abusive management practices. Kilstein Decl. at ¶¶ 42–43. Evidence presented by both parties supports the State's position.

150. Plaintiffs' expert reported that contract nursing costs may be 100% higher than salaried nursing costs; Plts.Exh. 40 at 1; one of the named plaintiffs confirmed this assessment. *See* Dorsky–Flynn Dep. at 228–29. At the same time, this higher cost does not result in better patient care. The plaintiff facilities testified in depositions that the quality of care provided by contract nurses is less than that provided by salaried nurses. Kantrowitz Dep. at 91; Goldstein Dep. at 58–60; Dorsky–Flynn Dep. at 228–29. Dr. Manard also agreed that contract nursing is not a desirable way to staff a nursing facility. Tr. at 3.70–3.72.

151. In view of the high cost of contract nursing and the general agreement that contract nursing is not as desirable as regular nursing staff, the Court cannot conclude that the State's decision to discourage the use of contract nursing by refusing to include its cost in the calculation of the screen is an arbitrary or capricious policy choice.

152. Furthermore, the evidence currently before the Court demonstrates that the use of contract nurses by New Jersey facilities has been limited and is currently decreasing. Plaintiffs' expert testified that in 1989, during the height of the alleged nursing shortage, only 5% of all nursing hours in New Jersey were provided by contract nurses. Tr. at 3.78–3.79; Manard Report at 34–35. A study conducted by plaintiffs' expert during 1989 on the basis of nationwide data showed contract nursing to account for 18% of all nursing hours. Tr. at 3.80. Thus, reliance on contract nursing in New Jersey has never been as great as in other parts of the country.

153. The evidence also shows that a significant proportion of New Jersey facilities is able to operate with only minimal or no contract nursing staff. In 1989, 123 out of

276 facilities reported using contract nurses for 2,000 hours or fewer. This represents less than a single full-time equivalent staff position per year. Engquist Decl. at ¶ 16. Of these, 61, or 22%, reported using no contract nursing. *Id.* This number includes one of the named plaintiff facilities, Greenwood House, which reports that it has never relied on contract nursing. Goldstein Dep. at 58–61.

154. In addition, the evidence before the Court amply demonstrates that the economic condition allegedly compelling facilities to use contract nurses—the nurse staffing shortage—is abating. Three of the named plaintiff facilities testified at their depositions that the nursing shortage has been alleviated due, in part, to the national recession. Kantrowitz Dep. at 88–89; Morgenstern Dep. at 76–77; Goldstein Dep. at 54–55. Two of the plaintiff facilities report that they are presently using significantly fewer contract nurses than in the past. Dorsky–Flynn Dep. at 268–69; Morgenstern Dep. at 78–79. Plaintiffs' expert agreed that this experience has been observed elsewhere in the country. Tr. at 3.81. Indeed, she stated that she refers to the nursing shortage in the past tense. *Id.* at 3.82.

155. Because the State reimburses facilities for contract nursing up to the screen, it appears that facilities will be reimbursed for modest amounts of contract nursing costs incurred to meet temporary and unavoidable staffing exigencies. The experience of named plaintiff Robert Wood Johnson Health Care Facility demonstrates this point. This facility reported that it has successfully reduced, although not eliminated, contract nursing costs. Dorsky–Flynn Dep. at 268–269. At the same time, the facility reported nurse staffing costs below the State's new reimbursement screen, and therefore was reimbursed for all of its nursing costs, including the cost of contract nurses. Defs.Exh. 11. This facility's experience demonstrates that limited use of contract nursing to meet unavoidable absences of regular staff can be accommodated within the present nursing screen and without significant hardship.

156. The State has not refused to reimburse all of the costs associated with contract nursing personnel; New Jersey reimburses contract nursing costs along with salaried nursing costs up to the reasonable wage and hourly limits imposed by the nursing screen. The State refuses only to include the cost of contract nursing in calculating the screen. The State thereby balances its interest in discouraging costly and less reliable temporary nursing staff and the facilities' need to use a moderate amount of contract nurses. The plaintiffs have not shown a reasonable likelihood of demonstrating that this policy judgment is unreasonable.

### iii. *Inflation Adjustments*

157. DHS uses an inflation factor to adjust the prospective rates, excluding certain capital items, from the midpoint of the base (cost reporting) period to the midpoint of the rate year. The inflation factor used by the state is based upon a weighted calculation of two indices:

(1) Average hourly earnings of manufacturing employees in New Jersey as published by the Bureau of Labor Statistics (weighted at 60%); and

(2) The Consumer Price Index as published by the Bureau of Labor Statistics (weighted at 40%).

N.J.A.C. § 10:63–3.18.

158. Dr. Manard analyzed the inflation factor and concluded that the DHS methodology has substantially underestimated market changes in the costs of goods and services that efficient and economical nursing facilities must purchase. *See* Lewin/ICF Report at 27–31. She determined that the price indices used by DHS to construct its inflation factor are only remotely related to nursing home input prices. Lewin/ICF Report at 27–29; Tr. at 1.117. For example, plaintiffs assert that over the period 1985–1989, the wages paid to manufacturing workers (which account for 60% of the DHS inflation factor) have increased at a rate almost three times slower than the wages paid to on-staff nursing facility personnel (12.9% v. 36.5%). Lewin/ICF Report at 28. The remaining portion (40%) of the DHS inflation factor, which is intended to account for non-wage operating costs, uses a Consumer Price Index measure that is only crudely related to the specialized

goods and products which a nursing facility must purchase in order to provide appropriate care to its patients. Lewin ICF Report at 28.

159. The DRI market basket index, described by plaintiffs as the best available national nursing home inflation index, Tr. at 1.117, demonstrates greater increases in recent years than the DHS index. Lewin/ICF Report at 31–32. For example, in setting the FY 1991 rates, DHS used an inflation factor for the period from July 1, 1989 through December 31, 1990 set at 6.327%, whereas the DRI inflation factor for the same period was 9.874%. *Id.* at 32. Defendants' expert agreed that the DRI index is a good predictor of price inflation experienced by nursing facilities. Tr. at 4.38.

160. For a facility with costs of approximately $80 per day, the difference between using the state's inflation factor and DRI would amount to approximately $87,000 over the course of one year. Lewin/ICF Report at 32; Tr. at 1.120.

161. DRI predicts changes in the prices of goods and services purchased by nursing facilities but does not attempt to predict changes in costs based on increases in the quantity of services required. *Id.* at 39–40; Tr. at 1.118; *see also* Tr. at 5.23 (Engquist cross-examination).

162. Def.Ex. 40 shows the percentage increases in average nursing facility costs and rates from 1979 to 1989. Tr. at 4.37–4.38. During this period, DRI increased by 74.6%, while average facility costs increased by 134.-8%.

163. Dr. Engquist testified that an efficient manager should have been able to keep cost increases in line with the DRI inflation index from 1979 to 1989, Tr. at 4.40–4.41, but admitted on cross-examination that DRI does not take into account the quantity of services provided in a nursing facility. Tr. at 5.23–5.24.[19] Dr. Engquist acknowledged that the quantity of required services increased to some degree over the past decade as a result of statutory and regulatory changes. Tr. at

5.24. Dr. Manard asserted that reasons for the increased intensity of services include the dramatic changes in society's expectations of nursing home quality, legislative initiatives, and certain demographic trends. Tr. at 5.73–5.75.

164. In preparing Def.Ex. 40, Dr. Engquist did not quantify the extent to which cost increases in excess of price inflation represented legitimate expenditures. Tr. at 5.28. Based upon the data in Def.Ex. 40, Dr. Engquist acknowledged that 90% of average facility costs were covered by average facility rates in 1979 but that only 83% of costs were covered by the rates in 1989; however, she cited no evidence of declining "efficiency" among facilities generally during that time. Tr. at 5.29.

165. The evidence showed that between 1984 and 1990 New Jersey facilities' costs grew more than twice as fast as the DRI inflation index which plaintiffs believe is the most accurate available measure of reasonable growth in nursing facility costs. Defs. Exh. 40. From the inception of the reimbursement system in 1979 to 1989, costs rose 135% while the DRI index rose 75%. *Id.* The fact that reported costs in New Jersey rose so much faster than this national index suggests that the costs were not subject to severe restraints. Of more significance, however, is the fact that plaintiffs' analysis of the adequacy of the State's inflation factor looks at only one aspect of the system which accounts for inflation. In addition to applying an inflation factor, the State accounts for inflation through its practice of rebasing rates and screens annually. Kilstein Decl. at ¶ 14; Tr. at 4.36. As a result of the combined effect of the State's inflation factor and annual rebasing, rates have increased much faster than either the State's inflation factor or the DRI index. The average rates for facilities increased 116.8% from 1979 to 1989. Defs.Exh. 41. Over the same period, the DRI index increased at a much slower rate of only 74.6%. *Id.*

166. Although reported costs over the same period increased by 136.8%, *id.*, the

---

**19.** Dr. Manard confirmed that DRI is strictly a *price* index, and in no way addresses the quantity

or intensity of services provided. Tr. at 5.70.

Boren Amendment does not require a state to guarantee that rates will increase in lock step with industry costs. The Boren Amendment was enacted in response to Congressional concerns that health care costs were increasing at rates far in excess of inflation. It would be contrary to the cost containment goals of the Boren Amendment to hold that states must ensure that payment rates to all facilities increase at the same rate at which nursing home costs increase. *See Folden,* 744 F.Supp. at 1536. In the instant case, costs have increased almost twice as fast as the price inputs measured in the DRI index. Defs.Exh. 40. Although there are factors other than price inputs that influence cost growth, such as the volume of required goods and services, the fact that payment rates also increased 56% more than price inputs as measured by the DRI appears to leave ample room to accommodate such other factors. In any event, plaintiffs have not demonstrated that this margin is insufficient to account for the other factors that reasonably increase costs.

167. The Court concludes that, when the effects of both rebasing and the State's inflation factor are taken into account, it is clear that the rates paid under New Jersey's reimbursement system have increased faster than the inflation index endorsed by the plaintiffs, although not quite as fast as costs reported by the industry. *See* Defs.Exh. 40. Given the cost containment goals of the Boren Amendment, plaintiffs have not demonstrated that this result is arbitrary and capricious.

#### iv. *Geographical Wage Equalization*

168. The median hourly rate for each staff category, as adjusted,[20] is multiplied by 115% to establish the hourly wage rate limit for each staff category. N.J.A.C. § 10:63–3.8(b)6. This amount is further adjusted to account for the salary differential for the geographic region in which the facility is located. N.J.A.C. § 10:63–3.8(b)4.[21]

169. The State uses three wage regions (high, medium and low) and adjusts reported wages so that facilities in the high and medium regions receive slightly higher reimbursement, and those in the low regions receive slightly lower reimbursement, than they would if unadjusted costs were used to set screens and calculate rates. This adjustment is intended to compensate for different economic conditions in different geographic regions of New Jersey. The adjustment is based on the ratio between the median of actual reported wages in a particular region and the median of actual reported wages statewide. Kilstein Decl. at ¶ 28.

170. Plaintiffs' expert criticized the wage equalization methodology as doing a poor job of explaining the differences in wage variations between the three geographical areas. *See* Tr. at 1.136.[22]

171. Defendants' expert testified that the wage equalization adjustment has a relatively minor effect on relative payment rates. Engquist Written Testimony at ¶ 24. This is illustrated by the fact that, over time, the equalization factors used in the medium and high regions have become almost identical because the median salaries reported in the high and medium salary regions have grown closer. Kilstein Decl. at ¶ 30; Defs.Exh. 5. In addition, these medians have grown quite close to the statewide median so that the effect of the adjustment has diminished, although not disappeared. *Id.* Median salaries in the low salary region also have grown closer to the statewide median, although not as rapidly as the other two regions have closed the gap. *Id.*

172. The State presented unrebutted evidence that elimination of wage equalization would cause a decrease in reimbursement to

---

**20.** The median hourly wage rate is adjusted to account for hours paid but not worked (*i.e.,* vacation, sick leave, and the like). N.J.A.C. § 10:63–3.8(b)2.

**21.** DHS uses three salary regions which are based upon 1970 census date, *i.e.,* high, medium, and low. The hourly salary rate is adjusted upward for the high (3.0%) and medium (2.6%) regions and downward (–6.6%) for the low region. N.J.A.C. §§ 10:63–3.3(a) 4 and 5; Lewin/ICF Report at 50; Tr. at 1.125.

**22.** Plaintiffs do not challenge the premise that the State could properly choose to adjust reimbursement to recognize higher and lower cost experiences in different geographic regions and the Court accepts this practice as a reasonable exercise of the State's discretion.

the facilities that are in the high and medium wage regions and that these facilities represent approximately 60% of the facilities participating in Medicaid. *See* Kilstein Decl. at ¶ 31.

173. Although Dr. Manard presented some evidence that the wage equalization formula could be improved by redrawing regions, Tr. at 3.120–3.121; Plts.Exh. 41, the change that she proposed goes to a level of detail in the design of the reimbursement system that is not appropriate for judicial intervention.

174. Plaintiffs have not demonstrated that their criticism of the wage equalization adjustment rises to the level of a Boren Amendment violation, as opposed to a policy disagreement with the State. It is not the role of this Court to resolve policy disputes, and it is therefore unlikely that the plaintiffs will establish a Boren Amendment violation on this basis.

175. As the moving party, plaintiffs bear the burden of establishing a likelihood of success on the merits with respect to the issues of both procedural and substantive compliance with the Boren Amendment. The Court concludes that, on the current record and at this preliminary stage of the litigation, plaintiffs have failed to satisfy this considerable burden.

## VIII. IRREPARABLE HARM

### A. The Legal Standards

176. As discussed *supra*, a party seeking a preliminary injunction must demonstrate *both* a likelihood of success on the merits and the probability of irreparable harm if relief is not granted. Despite the Court's conclusion that plaintiffs have failed to demonstrate a likelihood of success on the merits of their procedural and/or substantive claims under the Boren Amendment, the Court nevertheless will address plaintiffs' contentions regarding irreparable harm in the absence of preliminary injunctive relief. In order to satisfy this inquiry, the requisite injury must not only be irreparable, it must be imminent. *Holiday Inns of America, Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969) (plaintiffs must establish a "presently

existing actual threat"); *Premier Dental Products Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 858 (3d Cir.), *cert. denied*, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986), *reh'g denied*, 479 U.S. 1062, 107 S.Ct. 945, 93 L.Ed.2d 995 (1987). The Third Circuit has held that "[e]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987) (quoting *Continental Group Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir.1980)). Injunctive relief "may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights." *Holiday Inns of America*, 409 F.2d at 618; *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir.1989); *Ammond v. McGahn*, 532 F.2d 325, 329 (3d Cir.1976); *Falter v. Veterans Administration*, 632 F.Supp. 196, 201 (D.N.J.1986); *Sovereign Order of St. John v. Messineo*, 572 F.Supp. 983, 989 (E.D.Pa. 1983).

177. The affidavits of the representatives of the named plaintiff facilities describe at length the types of harm that allegedly afflict nursing facilities industry-wide as a result of purportedly inadequate Medicaid payment rates. *See* Pl.Ex. 10–14. Those affidavits, as summarized below, indicate that a number of common problems afflict the industry and consequently affect the public as a whole. Defendants argue in response that this case, like the challenge to Washington's Medicaid program in *Folden*, "is about money and not about quality of care." *Folden*, 744 F.Supp. at 1518.

### B. Plaintiffs' Allegations of Irreparable Harm

178. Through the affidavits and deposition testimony of the representatives of the individual plaintiff facilities, plaintiffs have attempted to demonstrate the types of serious harm present in the instant case which justify preliminary injunctive relief. Initially, plaintiffs assert that inadequate Medicaid reimbursement has forced many facilities to provide minimum levels of care and to reduce patient activities and social services contrary to the mandates of OBRA

1987 and OBRA 1990; this allegedly has occurred during a time period in which patient care requirements have been increasing. Plaintiffs assert further that, as a result of cash flow problems, needed maintenance and capital improvements have been postponed; in this regard, plaintiffs allege that although many facilities are providing only basic care and accommodations that Medicaid patients require, such facilities nonetheless have incurred costs in excess of Medicaid rates. *See, e.g.,* Plaintiffs' Proposed Findings at ¶¶ 112–114, 118–120, 121–125, 127, 130. Plaintiffs also assert that the Medicaid program's restrictions on payment for the direct costs of nursing care have forced facilities to curtail staffing and have required facilities to significantly restrain wage and benefit levels. As a consequence, facilities' staff often are overburdened and underpaid. This situation allegedly has resulted in a high rate of employee turnover, disrupting continuity of care, and reliance on expensive contract nursing agencies. *See, e.g., Id.* at ¶¶ 119, 123–124, 128–129. Faced with losses on Medicaid patients, plaintiffs argue that facilities have been forced to raise private pay rates, to seek charitable contributions in an effort to "cross-subsidize" the program's inadequate payment levels, or to go out of business altogether. *Id.* at ¶ 115. The Medicaid program allegedly has set payment rates at levels which have, plaintiffs argue, transferred the State's payment obligations to private payors; plaintiffs assert that the potential for continued cross-subsidization of this type is extremely limited. *See, e.g., Id.* at ¶¶ 115, 122, 131.

179. Plaintiffs attempt to make the requisite showing of irreparable harm absent an award of preliminary injunctive relief largely with reference to the conditions at individual plaintiff facilities rather than on an industry-wide basis.

### i. *Greenwood House*

180. Plaintiffs note that Greenwood House is a not-for profit facility whose patient population is approximately 72% Medic-

aid.[23] Plaintiffs assert that during the rate year ending June 30, 1990, the costs of providing patient care at Greenwood House were approximately $109 per day, while the facility's Medicaid rate for most of its patients was only $83.29 per day. Goldstein Aff. at ¶ 7. According to Goldstein, these losses of over $25 per patient per day have resulted directly from the fact that, in order to provide patients with the care they actually require, Greenwood House significantly exceeds the Medicaid program's reasonableness screens on various costs components. *Id.*

181. Over the past five years, the facility purportedly has incurred over $2.5 million of costs in excess of the nursing screens, and Goldstein does not expect the financial situation to improve under the current rate methodology. *Id.* at ¶¶ 8–9.[24] Furthermore, according to Goldstein, it is not likely that the disparity between costs and rates will improve because the facility is now admitting a higher percentage of patients with more serious medical conditions than in the past. *Id.* at ¶¶ 9, 23–26.

182. Greenwood House has responded to the problem of Medicaid underpayment by cutting back on costs in a variety of areas; these remedial measures include the reduction of patient activities, the postponement of ordinary maintenance, decreased security at the facility, and the reduction of maintenance, housekeeping, and social services staff. *Id.* at ¶ 17; Goldstein Deposition at 80–85, 103–05. The facility also has been depleting its building fund in order to meet ordinary operating expenses. Goldstein Aff. at ¶ 16.

183. In an effort to maximize admissions of the private-pay patients that allegedly subsidize the Medicaid losses, this facility has attempted to reduce its Medicaid patient census. *Id.* at ¶ 15. The facility simultaneously has increased its private-pay rates from $110 to $125 per day effective July 1, 1990 in an effort to alleviate alleged Medicaid payment

---

**23.** Affidavit Of Richard S. Goldstein ("Goldstein Aff.") at ¶¶ 1, 3, 4 (Pl.Ex. 10). Goldstein is the Executive Director of Greenwood House. *Id.* at ¶ 1.

**24.** Greenwood House experienced overall financial losses of $86,294 in 1987, $245,645 in 1988, $335,971 in 1989, and $408,171 in 1990. Goldstein Aff. at ¶ 9.

shortfalls. *Id.* at ¶ 14. By comparison, at the time Goldstein's affidavit was prepared, the facility's Medicaid rate was $90.27 per day. *Id.*

184. While Greenwood House has continued to provide care that meets the basic medical needs of its patients, *see* Goldstein Deposition at 33–34, it has only been able to do so by incurring substantial losses on Medicaid patients. Goldstein Aff. at ¶ 8. The facility purportedly has nearly reached the limit of its ability to raise funds from outside sources in order to cross-subsidize the program. *Id.* at ¶¶ 13, 16; Goldstein Deposition at 79.

### ii. *Medicenter Of Lakewood*

185. Medicenter of Lakewood, a proprietary facility that is 87% Medicaid, allegedly has been impacted adversely by DHS's reimbursement methodology.[25] As a proprietary facility, Medicenter is not able to compensate for losses on Medicaid patients through the solicitation of charitable contributions. Kantrowitz Aff. at ¶ 12. According to Mr. Kantrowitz, the facility relies upon the Medicaid program to pay the costs of properly caring for Medicaid patients. *Id.*

186. With respect to the rate year ending June 30, 1991, Medicenter purportedly had $425,000 of base-year costs in excess of the Medicaid program's reasonableness screens. *Id.* at ¶ 6. According to Kantrowitz, the cash flow problems at Medicenter of Lakewood became so severe within the last two years that the owners "considered" filing for bankruptcy. Kantrowitz Dep. at 54–55. Medicenter attempts to provide patient care that is appropriate for its mix of patients, but in order to do so, plaintiffs assert that the facility incurs substantial underpayments in the nursing cost area. Kantrowitz Deposition at 168–69.

187. This facility's alleged inability to offer competitive wage rates has led to a high rate of turn-over among nursing staff which, in turn, disrupts the continuity of care at Medicenter. Kantrowitz Aff. at ¶ 18. As a result, the facility must bear the cost of training new staff who may depart quickly for higher paying work at health care facilities that are able to offer more competitive wages. *Id.*[26] Medicenter also reports difficulty maintaining adequate wages and salaries for its professional staff and, for financial reasons, allegedly has had to refrain from hiring additional nursing staff. *Id.* at ¶ 19.

188. In an effort to stay within the Medicaid program's cost screens, the facility has attempted to cut costs in a number of areas, including delaying the purchase of new furniture needed in three wings, postponing needed roofing repairs, and delaying replacement of kitchen and food delivery equipment. *Id.* at ¶ 9. The reported decline of conditions at the facility over the past few years allegedly is reflected in the facility's declining private-pay census: whereas private-pay patients constituted 19% of the facility's patient population in 1988, such patients constitute only 10% today. *Id.* at ¶¶ 14, 21. As explained by Kantrowitz, as private-pay census declines, losses are compounded and the pressure to reduce the costs of patient care further intensifies for reasons unrelated to economic inefficiency. *Id.* at ¶ 21.

### iii. *Robert Wood Johnson*

189. Plaintiff Robert Wood Johnson is a not-for-profit facility with a patient population that is approximately 84% Medicaid.[27] The facility estimates that, for the most recent rate-year, it incurred *per diem* costs of approximately $110.00 per day but received a

---

**25.** *See* Affidavit Of Barry Kantrowitz ("Kantrowitz Aff.") at ¶¶ 1, 3, 4 (Pl.Ex. 11). Kantrowitz is the chief financial officer of Holiday Medical Center, Inc., doing business as Medicenter of Lakewood. *Id.* at ¶ 1.

**26.** Plaintiffs assert that the facility frequently is forced to obtain labor from contract nursing pools in order to maintain adequate staffing levels. *Id.* at ¶ 8. However, as discussed *supra*, the additional cost of this type of hiring is excluded from the costs used to establish the wage compo-

nent of the Medicaid program's reasonableness screens, thereby increasing the facility's losses on Medicaid patients. *Id.*

**27.** Affidavit Of Dayle Dorsky–Flynn ("Dorsky–Flynn Aff.") at ¶¶ 1, 3, 4 (Pl.Ex. 12). Dorsky–Flynn is Vice President for Operations, Presbyterian Homes of Northern New Jersey, Inc., an affiliate of the not-for-profit foundation which owns and operates Robert Wood Johnson. *Id.* at ¶ 1.

Medicaid rate of only $100.91 per patient per day. Dorsky–Flynn Aff. at ¶ 9.

190. According to Dorsky–Flynn, through concerted efforts, the facility has been able to subsidize Medicaid losses through charitable contributions available to it as a non-profit institution. *Id.* at ¶ 10. However, the facility reports that the increasing expense of caring for Medicaid patients now has begun to outstrip its ability to subsidize Medicaid losses through outside contributions. *Id.*

191. Dorsky–Flynn further states that the quality of care at Robert Wood Johnson can be expected to diminish significantly unless the Medicaid program revises its rate setting methodology to account properly for the actual costs of caring for Medicaid patients. *Id.* She asserts that Medicaid losses have forced the facility to pay nursing staff wages and benefits that are not competitive, resulting in a higher rate of turn-over among nursing employees. *Id.* at ¶ 13.

192. The facility reports a turnover rate, on average, in excess of 50% annually for nursing staff; this has a disruptive effect on the care that patients receive at the facility. *Id.* at ¶¶ 13, 17. As a consequence of the turnover rate, the facility has, at times, been forced to rely on contract nursing pools in order to maintain adequate staffing levels. *Id.* at ¶ 18. Because the additional costs of such hiring are not included in the costs used to establish the wage component of the Medicaid program's reasonableness screens, the facility alleges that its losses on the care provided to Medicaid patients are increased. *Id.*

193. Other areas in which Robert Wood Johnson purportedly has cut expenditures in order to compensate for the alleged discrepancy between actual costs of caring for Medicaid patients and rates paid by the program include a reduction of housekeeping staff, the elimination of a supervisor in the food services area, reduced security staffing, a reduction of expenditures on maintenance by in-creasing the workload of in-house staff and hiring fewer outside contractors, cuts to the facility's business and administration staff, postponement of needed upgrading of the water system, and reducing nursing staff. *Id.* at ¶ 12.

194. Dorsky–Flynn asserts that the postponement of such repairs has, at times, created "real safety problems" and may well have caused the facility to be temporarily out of compliance with state standards. Dorsky–Flynn Dep. at 161, 202, 214. She asserts further that the effects of the aforementioned cutbacks are made worse by the fact that, over time, the facility has continued to admit patients with more acute medical conditions, including many patients with Alzheimer's disease and other forms of dementia. Dorsky–Flynn Aff. at ¶¶ 19, 20. These patients require more intensive care; however, the facility allegedly has found that the current Medicaid rate methodology provides insufficient funding to meet these needs. *Id.*

#### iv. *Llanfair House*

195. At Llanfair House, a non-profit facility that presently has a patient population that is approximately 66% Medicaid,[28] the costs of caring for Medicaid patients allegedly exceed the Medicaid program's payment rates. Morgenstern Aff. at ¶ 7. In the fiscal year that ended June 30, 1990, the facility spent approximately $732,221 in excess of the program's reasonableness screens in caring for Medicaid patients. *Id.* Morgenstern asserts that he expects this situation to remain unchanged in the current fiscal year. *Id.* at ¶ 9. These shortfalls allegedly have occurred despite the facility's efforts to keep wages, salaries, and benefits to the bare minimum that will attract qualified nursing staff while, at the same time, satisfying the two unions that represent nursing staff.[29]

196. In an effort to alleviate an alleged staff turnover problem, the facility has raised its wages, thereby increasing costs. Moles Aff. at ¶ 9. According to Moles, despite

---

**28.** Affidavit Of Charles Morgenstern ("Morgenstern Aff.") at ¶¶ 2, 5 (Pl.Ex. 13). Morgenstern is Controller of Mega Care, Inc. *Id.* at ¶ 1.

**29.** Affidavit Of Daniel J. Moles ("Moles Aff.") at ¶ 9 (Pl.Ex. 14). Moles is a Vice President of

Mega Care, Inc. and the Administrator of Ashbrook Nursing Home, another nursing facility owned and operated by Mega Care, Inc. *Id.* at ¶ 1.

wage increases, RNs, LPNs and nurse aides still routinely leave the facility to take jobs at other types of health care facilities, such as hospitals, that are able to pay more competitive wage rates. *Id.* at ¶ 12. When this occurs, the continuity of patient care is disrupted and the facility purportedly is deprived of the full benefit of the resources it has expended in training staff. *Id.*

197. Under the DHS methodology, the State will pay for a maximum of one RN for each of the three eight-hour shifts per day for facilities, such as Llanfair House, which have over 150 beds. *Id.* at ¶ 15. In contrast, Llanfair House reports that it is necessary to staff the facility with 11–13 eight-hour RN shifts per day in order to meet its patients' needs. *Id.* In view of the serious medical conditions of the facility's patients, Moles explained that Medicaid recipients simply cannot achieve their maximum attainable quality of life with only one RN on duty to serve the entire patient population of this 180 bed facility. *Id.* Moles testified that, in general, "Llanfair House is falling short of its responsibility to provide the residents and patients who live there with the highest practical quality of life and quality of care" and stated that overall the care at Llanfair House is less than acceptable. Moles Dep. at 37, 39–40.

198. Plaintiffs allege that the physical plant of Llanfair House also has deteriorated. According to plaintiffs, needed maintenance and repairs that have been delayed at this facility include painting, wallpapering, replacement of obsolete handrails, remodeling of nursing stations, upgrading of lighting fixtures, replacement of floor and ceiling tiles, purchasing new furniture, replacement of worn bedspreads and draperies, upgrading the elevator system and nurse-call system, and redecorating common areas. *See* Moles Aff. at ¶ 8.

199. According to Moles, the deterioration of the facility has had a negative effect on patient morale and has detracted from the impression that the facility makes on prospective patients, especially the private-pay patients who allegedly are needed to help subsidize the losses on Medicaid patients.

*Id.* at ¶ 11. From June 30, 1987 to March 31, 1991, the facility's private-pay census decreased from a high of 82 private-pay patients in 1987 to a low of 48 private-pay patients today, a total decrease of approximately 41%. *Id.*

200. The most serious allegation raised by the plaintiffs is that reimbursement payments have led to inadequate patient care. In support of this claim, and as described in detail, *supra*, the affiants describe various conditions at the plaintiff homes that allegedly have affected adversely the quality of care being provided to Medicaid patients, such as inadequate staffing, deterioration of the facilities' physical plants as the result of an inability to make necessary repairs and capital improvements, and cash flow problems. Significantly, plaintiffs presented no evidence that the level of care currently being provided does not meet federal and state safety standards. In other Boren Amendment cases where plaintiffs have failed to substantiate their allegations of harm to patients, courts have rejected plaintiffs' claims of irreparable harm. *Troutman v. Cohen*, 588 F.Supp. 590 at 598–99 (E.D.Pa.); *Coalition of Michigan Nursing Homes, Inc.*, 537 F.Supp. 451 at 464–65 (E.D.Mich.1982). Moreover, in addition to the fact that plaintiffs presented no evidence to indicate that any Medicaid patients have suffered as a result, the affidavits upon which plaintiffs rely to demonstrate irreparable harm are weakened by the affiants' deposition testimony.

201. Analysis of the deposition testimony of the facilities' representatives significantly undermines what the Court has determined to be their largely conclusory allegations of immediate and irreparable harm. Representatives for three of the four named plaintiff facilities testified that their facilities have been able, at a minimum, to provide quality care consistent with legal standards. Kantrowitz Dep. at 167; Dorsky–Flynn Dep. at 160; Goldstein Dep. at 33, 79–80. One representative even described the care provided by his facility as "excellent." Goldstein Dep. at 33.[30] While the level of care paid for by

**30.** The one facility representative who did not

make this assertion was Daniel Moles of Llanfair

the Medicaid program may be less than the facilities would like to provide, consistent with religious or other humanitarian objectives, *see* Goldstein Aff. at ¶ 20; Dorsky–Flynn Dep. at 160; Kantrowitz Aff. at ¶ 11, absent a showing that the basic care needs of patients as defined by federal and state law, have not been met, plaintiffs have not made an adequate showing of irreparable harm.

202. Plaintiffs' sweeping allegations of irreparable harm also are undercut by the fact that many of the allegations contained in the plaintiff facilities' affidavits no longer appear to be true. For example, Dorsky–Flynn testified that many of the delayed capital improvements alleged in her affidavit had been made. Dorsky–Flynn Dep. at 111–13; 208–10. To the extent quality of care may have been affected during the short period before repairs were completed, such temporary reductions in the level of care do not constitute irreparable harm. *Coalition of Michigan Nursing Homes, Inc.*, 537 F.Supp. at 465 n. 45 ("[a]n incremental reduction in the quality of care for a period of time does not constitute irreparable injury"). Additionally, although Kantrowitz asserted in his affidavit that the facility had been unable to hire an additional supervisor for financial reasons, he testified at his deposition that a supervisor had in fact been hired. Kantrowitz Dep. at 203–04. That same facility now apparently has a current reimbursement rate in excess of its current costs, even though the facility projected a substantial loss on Medicaid in the current year. Kantrowitz Dep. at 77–79.

203. Plaintiffs rely on two cases in which courts accepted plaintiffs' claims that reductions in Medicaid payments to providers would cause irreparable harm to patients. *Pinnacle Nursing Home v. Axelrod*, 719 F.Supp. 1173 (W.D.N.Y.1989), *aff'd in part, rev'd in part*, 928 F.2d 1306 (2d Cir.1991), and *Nebraska Health Care Ass'n v. Dunning*, 578 F.Supp. 543 (D.Neb.1983). Plaintiffs in *Dunning* and *Axelrod* based their allegations of irreparable harm in large part upon significant reductions in the level of Medicaid reimbursements provided by the

states. *See Axelrod*, 719 F.Supp. at 1180 (increasing shortfall occasioned by downward adjustment of rates); *Dunning*, 578 F.Supp. at 544–545 (reductions of reimbursements of up to fourteen percent). In the instant case, however, changes made in the 1990 State plan resulted in a $14 million *increase* in reimbursement. Kilstein Decl. at ¶ 20. Although higher payments do not necessarily translate into higher levels of care, one can reasonably assume that higher payments will tend to result in higher levels of care. Consequently, proof that patient care has declined or will decline under the State's new methodology requires more than mere assertions by plaintiffs.

204. Defendants assail plaintiffs' allegations of irreparable harm in the absence of preliminary injunctive relief on a facility by facility basis. As demonstrated below, the defendants effectively undermined the assertions contained in the affidavits of the representatives of the named facilities; the combination of the affidavits and subsequent deposition testimony of these representatives demonstrates that plaintiffs have failed to establish the existence of irreparable harm absent preliminary injunctive relief.

#### v. *Greenwood House*

205. Defendants note initially that Greenwood is not an efficiently and economically operated facility, even under Dr. Manard's definition, because it is in the highest cost quartile. Tr. at 5.58. Dr. Manard testified that she was not concerned that such facilities were not reimbursed for all of their costs. Tr. at 1.95, 3.45. Goldstein did not state, as plaintiffs assert, that the facility's losses were the direct result of "provid[ing] patients with the care they actually require;" to the contrary, Goldstein stated only that the losses were the result of the fact that the facility exceeded the State's reasonableness screens in a number of areas. Goldstein Aff. at ¶ 7. In particular, Goldstein said that Greenwood loses money on nursing costs because it staffs in excess of the reasonableness limits in order to provide "high quality" care

---

House. The representative stated only that in his opinion care was "less than acceptable." Moles Dep. at 40. He did not express an opinion as to whether or not the care being provided was

below state and federal standards. Moles testified that he does not know whether the present administrator or director of nursing at Llanfair House shares his opinion. *Id.* at 40.

consistent with the facility's "mission". *Id.* at ¶ 20. Greenwood presented no evidence that the alleged losses were necessary to provide legally requisite care, and Goldstein's statement indicates that the facility has provided nursing services beyond what is legally required. Although the facility is to be commended for providing care above that which is legally required, the State is not required under the Boren Amendment to reimburse costs which are not necessarily incurred.

206. Moreover, even assuming that the facility's losses on nursing costs are as alleged, plaintiffs presented no evidence to show that the alleged losses were the result of inadequate reimbursement rather than providing a level of care beyond what is legally required. Goldstein's assertion that the facility is admitting a higher percentage of patients with more serious medical conditions than in the past is based solely upon a general belief that patients are getting sicker rather than any concrete data. Goldstein Dep. at 167.

207. The facility's alleged efforts to reduce costs do not appear to have led to inadequate care. In fact, Goldstein described the level of care provided by the facility as "excellent," Goldstein Dep. at 33, and as "the type of care that I feel that every person in this state deserves." *Id.* at 80. In addition, although Goldstein stated in his affidavit that the facility has had to deplete its building fund to compensate for operating deficits, he admitted at his deposition that the fund has not been entirely depleted. *Id.* at 114.

208. Plaintiffs have produced no evidence to demonstrate that the alleged efforts to increase the private pay census and to attract more private pay patients have harmed private pay patients or decreased the availability of Medicaid beds.

209. Plaintiffs also have not demonstrated that the facility's alleged losses on Medicaid patients are the result of anything other than a conscious decision on the part of this facility to provide greater levels of care than that which is legally required. In addition to acknowledging the facility's provision of superior nursing care, Mr. Goldstein also testified at his deposition that the facility incurs costs that other facilities would not necessarily incur because of the facility's large Jewish population, such as the costs associated with providing kosher meals and religious services. *Id.* at 33–38. As such costs cannot be considered to be costs which must be incurred, the State is not responsible for budget shortfalls resulting from those expenditures.

#### vi. *Medicenter of Lakewood*

210. Defendants deny what they characterize as plaintiffs' conclusory allegation that Medicenter–Lakewood has been adversely affected by the State's reimbursement system. In the current rate year, the facility's per diem Medicaid rate exceeds the facility's estimate of its *per diem* costs. Kantrowitz Dep. at 77–79. A substantial portion of its losses in 1989 resulted from the facility being forced to bear increased general services costs imposed by its parent corporation to compensate for the parent's business setbacks. Kantrowitz Dep. at 104–106.

211. Moreover, plaintiffs' suggestion that the facility's alleged cash flow problems are the result of inadequate reimbursement is flatly contradicted by the record. Plaintiffs do not respond to defendants' allegation that, around the time the facility supposedly considered filing for bankruptcy, the facility told Medicaid officials that it was incurring excess operating costs because of overstaffing; apparently, in anticipation of legislation that would extend Medicare payments, the facility hired nursing staff that it could not afford once the law was repealed. *See* Kohler Decl. at ¶ 25; Kantrowitz Dep. at 55–56. Clearly, the State cannot be held responsible for losses occasioned by the facility's poor business judgments. Similarly, the State is not responsible for the facility's alleged losses in the nursing cost area simply because those losses have occurred. Plaintiffs must demonstrate that the facility cannot provide adequate care at costs at or below the State's reasonableness screens, and they have failed to do so.

212. Plaintiffs have presented no evidence in support of the conclusory allegations regarding Medicenter's alleged inability to maintain adequate staffing levels, and the

extensive deposition testimony indicates that they are unfounded. For example, although Kantrowitz initially asserted that the facility had been unable to hire an additional supervisor, Kantrowitz Aff. at ¶ 19, he testified at his deposition that an additional supervisor had been hired. Kantrowitz Dep. at 203–04. He also testified that he does not know how many nurses are needed and that he does not have any personal knowledge of the facility's staffing requirements. *Id.* at 204–05.

213. Medicenter–Lakewood has a large maintenance carry-over of $407,697. This figure represents the amount of money that the facility can spend on maintenance repairs and for which the facility may receive reimbursement under the New Jersey plan. Kantrowitz Dep. at 96. The facility's allegation that it cannot make necessary repairs and capital improvements is therefore unfounded. Moreover, with respect to the alleged decline in the facility's private-pay census, plaintiffs have not demonstrated how this alleged decline has harmed Medicaid or even private-pay patients.

### vii. *Robert Wood Johnson*

214. Robert Wood Johnson is not an efficiently and economically operated facility under Dr. Manard's definition because it is in the highest cost quartile. Tr. at 5.58. Accordingly, the facility's alleged losses include amounts that result from inefficient and uneconomical operation rather than from inadequate Medicaid reimbursement. For example, in 1989 the facility paid $253,455 in management fees to the Presbyterian Homes Foundation. Defs.Dep.Exh. at 13. This amount was $131,278 over the State's reasonableness limits. The facility's alleged losses for the most recent rate year include a depreciation expense of $160,000, even though depreciation is not an actual expense. Dorsky–Flynn Dep. at 74–75, 105–07. Furthermore, Dorsky–Flynn testified that the facility is able to provide care which meets the basic needs of its residents. *Id.* at 160.

215. Robert Wood Johnson has not presented evidence demonstrating that its alleged Medicaid losses are the result of costs that must be incurred by an efficiently and economically operated facility in order to provide legally requisite care and services.

Indeed, the record indicates that the facility has exaggerated its losses and incurred unnecessary costs.

216. Moreover, the facility's criticism of the nursing screen is without merit, particularly in light of the fact the facility has had all of its nursing costs covered under the current reimbursement system that recognizes 2.5 hours, plus acuities, per patient per day. Defs.Deposition Exh. 45. The facility has been able to bring its nursing costs below the screen by substituting LPNs for RNs as permitted under the new regulations. Dorsky–Flynn Dep. at 199–200. Dorsky–Flynn's fear of what may happen if the State's methodology is not revised does not constitute an adequate basis for granting preliminary relief. In addition, although Dorsky–Flynn claims in her affidavit that the facility cannot pay competitive wages, she testified at her deposition that nurse staffing salaries were competitive in 1988, Dorsky–Flynn Dep. at 157–158, and are currently competitive. *Id.* at 224. In addition, Dorsky–Flynn testified that Robert Wood Johnson is currently using substantially less contract nursing than in the past. Dorsky–Flynn Dep. at 268–69.

217. Many of plaintiffs' other allegations as to this facility were undercut substantially by Dorsky–Flynn's deposition testimony. At her deposition, she admitted that many of the purportedly delayed capital improvements had, in fact, been made. *Id.* at 111–13, 208–10. She also testified that the facility's maintenance and repair costs were $140,334 under New Jersey's screen. *Id.* at 265–66. Consequently, the facility could have substantially spent more on maintenance and repairs and received reimbursement for those costs up to the screen.

218. The facility presented no evidence to support the contention that it is admitting patients with more acute conditions. To the extent that the some patients may require care above the 2.5 standard, additional reimbursement is provided under the State's acuity system.

### viii. *Llanfair House*

219. Llanfair House is not an efficiently and economically operated facility under Dr. Manard's definition because it is in the sec-

ond highest cost quartile. Tr. at 5.58. Moreover, defendants have demonstrated that many of the alleged losses are the result of unnecessary costs rather than inadequate reimbursement. For example, Llanfair's alleged losses in 1990 included $170,000 in administrative expenses above the State's reasonableness limits. Defs.Exh. 39 at 14. In 1989, the facility reported $279,747 as a depreciation expense, Morgenstern Dep. at 97–98, while the facility's total alleged losses for the year were not substantially higher— $383,000. Morgenstern Aff. at ¶ 8. The facility also has high capital expenses as a consequence of a change in ownership in 1986, which resulted in the revaluation of the facility from $3.3 million to $8.8 million. Defs.Exh. 39 at 14.

220. Furthermore, in contrast to his affidavit testimony, Moles testified at his deposition that the turnover rate among nursing staff has stabilized, resulting in improved quality of care. *See* Moles Dep. at 42.

221. Plaintiffs have presented no proof whatsoever for Moles' allegation that 11–13 eight-hour RN shifts per day are necessary to meet patient care needs. Additionally, although Moles stated in his deposition that he did not believe that the care provided was adequate to provide "the highest practical quality of life and quality of care," *id.* at 37, he did not assert that the care provided was inconsistent with legal requirements.

222. Like Robert Wood Johnson, Llanfair House has maintenance and repair costs under the screen. Morgenstern Dep. at 95–96. On that basis alone the Court finds that the facility's allegations concerning deterioration of its physical plant are unpersuasive.

223. Additionally, the Court concludes that Moles' assertion concerning the effect on patient morale of the alleged deterioration in the facility's physical plant is not based on any personal knowledge; Moles testified at his deposition that he has never had a conversation with a Llanfair House resident. Moles Dep. at 44. In any event, his assertions of deterioration in the physical plant are undercut substantially by the facility's failure to spend up to the screen for maintenance and repair costs. With regard to the alleged decline in the facility's private-pay census, the facility has demonstrated no resulting harm to Medicaid or private-pay patients.

224. As a general matter, plaintiffs also have failed to present any evidence that nursing homes are going out of business in appreciable numbers. If the reimbursement rates were as grossly inadequate as plaintiffs contend, there would be some objective evidence of facilities being unable to provide the legally required level of care, or of facilities going out of business, either voluntarily or involuntarily, as a result of providing required care under inadequate rates. The fact that facilities are not closing can constitute persuasive evidence that plaintiffs have not shown irreparable harm. *See Temple University*, 941 F.2d at 214. In fact, the record indicates that very few facilities have closed over the last several years, and those that have gone out of business are small facilities whose departure from the industry has not resulted in an appreciable loss of patient beds. Kohler Decl. at ¶¶ 20, 21. The evidence also demonstrates that applications to build new facilities or to expand existing ones have been substantial. Kohler Decl. at ¶ 19. If reimbursement rates were resulting in widespread harm to the industry as alleged by plaintiffs, the number of facilities leaving the system presumably would be substantially higher and the number of those entering the system substantially lower than in fact has been the case.

225. Plaintiffs further allege that they are suffering substantial financial losses as the result of shortfalls in Medicaid reimbursement. *See* Goldstein Aff. at ¶¶ 7–9; Dorsky–Flynn Aff. at ¶¶ 7–9; Morgenstern Aff. at ¶¶ 7–9; Kantrowitz Aff. at ¶¶ 6, 7. Defendants do not dispute that these losses have occurred. However, plaintiffs have not shown that these losses are the likely result of inadequate payments, rather than the result of inefficient and uneconomical operations on the part of the facilities.

226. To obtain a preliminary injunction, the moving party must establish some relationship between the defendants' conduct and the harm of which plaintiffs complain. Even if the moving party is irreparably

harmed, relief will not be granted unless it can be shown that the harm is the direct result of actions by the defendant. *Elliot v. U.S. Fish & Wildlife Service,* 747 F.Supp. 1094, 1100 (D.Vt.1990) ("[a]n injunction should not issue ... where the harms are unrelated to the law relied upon"). Plaintiffs have not established that their alleged losses are the result of the defendants' failure to pay costs that must be incurred by efficiently and economically operated facilities in violation of the Boren Amendment; they have demonstrated only that their costs have exceeded Medicaid reimbursement. Because plaintiffs have not presented evidence that their losses are related to costs which the State was obliged to reimburse, the Court finds that plaintiffs have failed to satisfy their burden of proof on this issue.

227. There is ample evidence in the record suggesting that the alleged losses suffered by plaintiffs are the result of inefficient and uneconomical operation rather than inadequate reimbursement. As discussed above, the types of unnecessary costs incurred by facilities include amounts of nursing hours in excess of the 2.5 hour (plus acuity hours) standard (and even the 2.75 advisory standard), excessive related party management costs and low occupancy. For example, the Court notes that defendants' Exhibit 39 is replete with examples of costs that, at least on their face, are examples of inefficient and uneconomical operations.

228. Moreover, Dr. Manard acknowledged that a loss on Medicaid does not necessarily mean that a facility will suffer a loss overall. Tr. at 3.98. This results from the fact that there are other sources of income, principally private payors for all facilities and charitable contributions for non-profit facilities. Dr. Manard further acknowledged that a nursing facility operator will evaluate his or her financial position on the basis of cash flows from all sources, including non-Medicaid sources. *Id.* However, the evidence presented in this case deals solely with alleged losses in the Medicaid program. Dr. Manard admitted that she had no data on the extent to which the Medicaid losses she identified are causing overall losses or only a decline in profits. Tr. at 3.100–3.101. None of the named plaintiff facilities presented any such evidence either.

229. The plaintiffs in this case acknowledge that they have been able to sustain the alleged losses to a certain extent by charitable contributions, Goldstein Aff. at ¶ 13; Goldstein Dep. at 142–43; Dorsky–Flynn Aff. at ¶ 10, and by increases in rates to private pay patients. Goldstein Aff. at ¶ 14; Dorsky–Flynn Aff. at ¶ 21; Morgenstern Aff. at ¶ 15; Kantrowitz Aff. at ¶ 13.

230. Plaintiffs' expert testified that non-profit facilities, which comprise one third of the facilities in New Jersey, often make up for losses on Medicaid patients from charitable contributions from the facilities' supporters. Tr. at 3.85–3.87. Indeed, Dr. Manard found in a study that she conducted in New York that, despite losses of $300,000 per year, there was no evidence of non-profit facilities being put up for sale or closing down. Tr. at 3.87. The non-profit plaintiffs in this case have not shown that financial support from charitable sources is no longer available. Indeed, plaintiffs' expert admitted that she could not predict how much financial support religious or philanthropic organizations would be willing to contribute to the care of the elderly. Tr. at 3.89.

231. Plaintiffs argue that private payors and charitable supporters should not be required to subsidize the Medicaid program. While plaintiffs are correct that the State may not ultimately shift its responsibility to pay for the care of Medicaid patients to these sources, it is still relevant to the issue of irreparable harm whether other sources of income are available to forestall severe financial distress. It is clear that there are sources of income other than Medicaid available to plaintiffs and that plaintiffs have made no showing that these other sources are inadequate to keep them in business. In view of the paucity of facility closings, discussed *supra,* it appears to the Court either that the Medicaid losses reported by plaintiffs are not as serious as alleged or that the other sources of income are adequate.

232. The availability of sources of income in addition to Medicaid payments suggests that the alleged Medicaid losses

represent nothing more than a loss in real profits in the case of for-profit facilities and a reduction in the amount of funds in excess of expenses in the case of non-profit facilities. Plaintiffs clearly have failed to prove to the contrary. Because loss of profits is not a sufficient predicate for preliminary injunctive relief in this Circuit, *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir.1976), plaintiffs have not met their burden of establishing irreparable harm.

## C. *Eleventh Amendment Considerations*

■ 233. Plaintiffs rely heavily upon the Eleventh Amendment prohibition against an award of retroactive monetary damages against a state in attempting to establish a likelihood of irreparable harm in the absence of preliminary injunctive relief.

■ 234. Under the Eleventh Amendment to the United States Constitution,

the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of any foreign state.

U.S. Const. Amend. XI. While the explicit language of the Amendment implicates only suits commenced or prosecuted against a state by citizens of another state or nation, its meaning has been extended to protect a state from suits brought by its own citizens as well. *See Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Spicer v. Hilton*, 618 F.2d 232, 235–236 (3d Cir.1980). The Eleventh Amendment operates to bar awards of retrospective monetary judgments against a state. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). "This court has read the *Edelman* decision as closing the door on any monetary award from the state treasury, whether the claim arises under state law, under federal law made binding on the states by virtue of the supremacy clause, or under the Fourteenth Amendment directly." *Spicer v. Hilton*, 618 F.2d at 236; *see also Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

235. Plaintiffs argue that "there is no adequate remedy at law" as a result of the Eleventh Amendment prohibition, and consequently that "there is a probability of irreparable harm in this case." [31] Plaintiffs' Proposed Findings at ¶ 69. Plaintiffs rely upon the Third Circuit's decision in *Temple University* in which the court stated that "[a]s to the inadequacy of legal remedies, the Eleventh Amendment bar to an award of retroactive damages against the [state] clearly establishes that any legal remedy is unavailable and that the only relief available is equitable in nature." *Temple University*, 941 F.2d at 215 (citations omitted). Plaintiffs conclude that "[u]nless interlocutory relief is provided by this Court, the plaintiffs will continue to suffer serious harm during the pendency of this action which will be irreparable." Plaintiffs' Proposed Findings at 17.

236. Defendants note in response to plaintiffs' argument concerning the Eleventh Amendment that the trial court in *Temple University* ordered the Commonwealth of Pennsylvania to rewrite its hospital reimbursement plan only after a full trial on the merits and a final determination that the rates at issue were invalid under the Boren Amendment. Defendants argue that, in the instant case, plaintiffs seek to invalidate and rewrite New Jersey's plan without the benefit of facts and arguments presented at trial, and that such relief would not only be more intrusive than that accepted by the Third Circuit in *Temple University*, but it would be based upon a substantially less complete record; defendants argue further that, even as-

---

**31.** The sole reference by either party to the possibility of seeking relief in a New Jersey state court or administrative body is plaintiffs' statement that, "[a]s a practical matter, there is so much uncertainty associated with an action to recoup money damages in a state court action that there may never be an opportunity for effective relief if Boren Amendment violations are allowed to continue during the pendency of a federal action. *See Illinois Health Care Ass'n v. Quern*, No. 77 C 1109 (N.D.Ill., Jan. 31, 1983), *reported in* [1983–1 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 32,396 at 10,007 (Pl.Ex. 24)." The Court notes that relief has been sought in several state court proceedings, including *Hillhaven, Inc. v. State of Nevada, et al.*, No. CV88–6222 (Dec. 10, 1992), and *Tioga Pines Living Center, Inc. v. Indiana Dept. of Public Welfare*, No. 30C01–9002–CP–125 (Indiana Cir.Ct., Sept. 18, 1991).

suming that plaintiffs may incur some losses for which they cannot be compensated, they have nonetheless failed to demonstrate that those losses are serious and imminent as required for any award of preliminary injunctive relief.

237. Defendants also assert that plaintiffs' lengthy delay in seeking preliminary injunctive relief is relevant to the Court's Eleventh Amendment inquiry. In this regard, defendants note that while plaintiffs commenced this action in May 1990, they waited a year before moving for preliminary injunctive relief. Plaintiffs claim that they required this period for their expert, who was retained in December 1989, to complete her report. The Court does not find this explanation to be persuasive. As early as January 1990, plaintiffs had a cost-rate analysis compiled by a local consultant, which produced substantially the same results as Dr. Manard's study. Plts.Exh. 8.

238. As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury. *See Lydo Enterprises, Inc. v. City of Las Vegas,* 745 F.2d 1211, 1213 (9th Cir.1984); *Warner Lambert Co. v. McCrory's Corp.,* 718 F.Supp. 389, 394 (D.N.J.1989); *Headwaters, Inc. v. B.L.M., Medford Dist.,* 665 F.Supp. 873, 876 (D.Or. 1987). In this case, the delay also tends to undermine plaintiffs' reliance on the Eleventh Amendment to establish irreparable harm. Although plaintiffs were well aware of the Eleventh Amendment bar to damages, they nonetheless waited a significant period of time before seeking interim relief. Having chosen to wait that long, they cannot now argue that the Eleventh Amendment bolsters their otherwise inadequate showing of irreparable harm. Even assuming that they will suffer some loss for which they cannot obtain compensation, plaintiffs have failed to demonstrate that those losses are sufficiently certain or serious to warrant a preliminary injunction.

239. The Court agrees with defendants' argument which, although combining to some degree the distinct inquiries relating to likelihood of success on the merits and irreparable harm, demonstrates that plaintiffs' nearly exclusive reliance upon *Temple University* is misplaced. While the potential unavailability of monetary damages from the State surely constitutes a significant factor which must be considered in analyzing the propriety of preliminary injunctive relief, such analysis cannot begin and end with the Eleventh Amendment as argued by plaintiffs. Absent a showing by plaintiffs of a likelihood of success on the merits, the inadequacy of legal remedies, a balancing of competing claims of injury and the public interest, this Court may not award preliminary injunctive relief. *See Temple University,* 941 F.2d at 215.

240. Irreparable harm to facility residents must be demonstrated independently and will not be presumed. *Troutman v. Cohen,* 588 F.Supp. 590, 598–99 (E.D.Pa.), *aff'd mem.,* 755 F.2d 924 (3d Cir.1984); *Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451, 464–65 (E.D.Mich.1982). As discussed in detail *supra,* plaintiffs have not made the requisite showing of irreparable harm sufficient to warrant injunctive relief. Three of the named plaintiffs—Greenwood, Robert Wood Johnson and Llanfair—are in the two highest cost quartiles, Tr. at 5.58, and therefore are not efficiently and economically operated facilities under Dr. Manard's definition. The one named plaintiff in the lower cost quartiles—Medicenter—currently receives a rate that covers its costs. Kantrowitz Dep. at 77–79. Accordingly, the Court concludes that none of the named plaintiffs are in a position to demonstrate that New Jersey's Medicaid reimbursement system is causing them irreparable harm. Additionally, plaintiffs have not distinguished, as they must, between costs that are necessary to provide care and services in conformity with state and federal standards and costs which are unnecessary to that end. Defendants have demonstrated to the Court's satisfaction that several key assertions made by plaintiffs' representatives are either incorrect, overstated or not based upon personal knowledge. Accordingly, the Court concludes that plaintiffs have not established a probability of irreparable harm if preliminary injunctive relief is not awarded.

## IX. *BALANCING OF HARDSHIPS AND PUBLIC INTEREST*

241. As discussed, *supra,* the Court must consider in ruling on a motion for pre-

liminary injunctive relief the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. *See, e.g., Morton v. Beyer,* 822 F.2d 364, 367 n. 3 (3d Cir.1987).

242. With regard to the former consideration, defendants argue that, in order to remedy the harm alleged to have been suffered by plaintiffs, the State presumably would have to spend tens of millions of dollars. Such expenditure, defendants assert, would cause harm to other public welfare programs administered by the State. Defendants argue further that plaintiffs' financial harm must be balanced against the more immediate harm which will be suffered by those who would have been direct recipients of public services, but for the increase of plaintiffs' share of severely limited largesse. *Coalition of Michigan Nursing Homes, Inc.,* 537 F.Supp. at 465. Defendants argue that if plaintiffs do in fact prevail on the merits after trial, they will have endured only a temporary shortfall in payments, which have not been shown to jeopardize the well-being of any nursing home resident or the survival of any nursing facility in the State.

243. Plaintiffs correctly note in response that the mere unavailability of appropriated funds does not excuse noncompliance with the Boren Amendment. *AMISUB,* 879 F.2d at 801, *quoting Alabama Nursing Home Ass'n v. Califano,* 433 F.Supp. 1325, 1330 (M.D.Ala.1977).

244. With regard to the public interest inquiry, plaintiffs assert that the public has a strong interest in assuring that New Jersey's elderly and disabled citizens receive the level and quality of care to which they are entitled. Defendants acknowledge this indisputable interest, but argue that there is a countervailing public interest in conserving the State's resources and its ability to fund other worthy public assistance programs.

245. With respect to both the balancing of hardships and the public interest, the Court concludes that the balance does not tip decidedly toward either party on either issue. The deeply-rooted but competing public policies at stake in litigation such as this are such that neither may be deemed superior for purposes of resolving a motion for preliminary injunctive relief. Accordingly, the Court finds that these considerations weigh neither in favor of nor against the relief sought by plaintiffs.

## X. CONCLUSION

246. The Court concludes at this time that New Jersey's Medicaid reimbursement plan, whose salient features include annual rebasing and cost-plus enhancement factors, is a carefully-designed, non-budget-driven system under which reimbursable costs have a clear nexus to statutory objectives.

247. Accordingly, for all of the reasons discussed, plaintiffs' motion for preliminary injunctive relief is denied.